UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN HALLAL, individually, on behalf of himself )
and all other minority shareholders similarly )
situated and in the Right of and for the )
Benefit of Medical Solutions Management, Inc., )
               Plaintiff )
 )
VS. )
 )
VICIS CAPITAL MASTER FUND LTD., )
VICIS CAPITAL, LLC, )
CHRISTOPHER D. PHILLIPS, )
LOWELL FISHER, JR., )
SHADRON STASTNEY, MDWERKS, INC. )
HOWARD KATZ & GREG ROBERTS )
              Defendants, )
 )
And )
 )
MEDICAL SOLUTIONS MANAGEMENT, INC., )
 )
         Nominal Defendant. )

C.A. NO. 12-CV 10166

## VERIFIED DERIVATIVE SHAREHOLDER AMENDED COMPLAINT AND JURY DEMAND

### I.    INTRODUCTION

The plaintiff, John Hallal, in the Right of and for the Benefit of Medical Solutions

Management, Inc., ("MSMI") and on behalf of himself and all other minority MSMI

shareholders similarly situated brings this action for damages arising from defendants' violations

of law, including, but not limited to, their breach of fiduciary duty, conspiracy to commit breach

of fiduciary duties, negligence, breach of contract, interference with contractual relations and

unfair and deceptive business practices.

At all times relevant, the defendant hedge fund, Vicis Capital Master Fund Ltd. ("Vicis

Fund" ) and its manager, Vicis Capital, LLC ("Vicis Capital") (together referred to as "Vicis" or

the "Vicis Defendants") was engaged in a $150 Million investment strategy that included the takeover of numerous promising companies through equity purchases and the acquisition of convertible debentures and warrants. Once the Vicis Defendants obtained majority ownership or voting control of such companies, Vicis often exercised pervasive control of company operations by controlling company funding and installing its own executives and other favored individuals in top management positions who thereafter would carry out the instructions of Vicis in complete disregard of both company and minority shareholder interests. . MSMI was one such company and defendant MDwerks, Inc., ("Mdwerks") was another. Vicis's unlawful manipulation of these companies in this instance ended in the felony wire fraud convictions of Vicis officers and the complete destruction of these publicly traded companies.

Throughout 2006 and 2007, the Vicis Fund steadily acquired a majority stake in MSMI through a series of transactions arranged primarily by defendant Christopher Phillips ("Phillips") and his third party investment bank, Midtown Partners & Co. LLC ("Midtown Partners"). By July of 2007, Vicis had acquired almost 80% of MSMI common stock and voting control. Vicis thereafter instructed that MSMI's chief executive officer be terminated and replaced with defendant Lowell Fisher ("Fisher"). In addition, Vicis installed the founding partner and Chief Operating Officer of Vicis Capital, Shadron Stastney ("Stastney") on MSMI's board of directors and gained control over MSMI finances through a variety of funding mechanisms. At all times relevant to this Complaint, Vicis controlled a majority of MSMI voting stock, directly controlled MSMI finances and controlled major MSMI management decisions.

In 2007, Vicis through Stastney, required MSMI to purchase, as part of an $8 Million loan, certain highly discounted medical receivables claims from a California company, Deutsche Medical Services, Inc. ("DMS"). DMS was owned and controlled by Sirous Sorat ("Sorat")

who, unbeknownst to Plaintiffs, had engaged DMS in a scheme to sell fraudulent medical

receivables to MSMI. Vicis and Stastney mandated the purchase of these receivables (the "DMS

Receivables") over the objections of MSMI staff and minority shareholders even though MSMI's

business activity was wholly unrelated to the collection of medical claims receivables. Vicis

insiders, Phillips and Midtown Partners, brokered this $8 Million transaction and received a fee.

The DMS Receivables were in fact, substantially fraudulent.

The collection of the DMS Receivables required a tremendous investment of MSMI time

and capital to hire and train collections staff. Collections operations were so problematic that

eventually, MSMI hired an outside contractor, Global Healthcare Recovery, Inc. ("Global"), to

assume control of DMS Receivable collection efforts. In addition, Stastney hired Phillips and

Midtown Partners, to assess MSMI operations in Massachusetts.

Following the Phillips assessment, Stastney hired Lowell Fisher ("Fisher") to serve as

MSMI president. Fisher reported directly to Phillips and Stastney for direction on all decisions

regarding MSMI operations. At approximately the same time Phillips became a managing

director of Vicis Capital and was given charge of managing the Vicis Fund's $8 Million

investment in the DMS Receivables. Phillips reported directly to Stastney on matters related to

MSMI and Phillips, and Vicis  concocted a scheme by which they could divert funds from

MSMI to MDwerks and inflate MDwerks profits. In clear conflict with and breach of their

fiduciary duties, Stastney, Phillips and Vicis Capital ordered MSMI's newly acquired DMS

Receivable business contracted out to MDwerks (the "MDwerks Contract"). Stastney, Phillips

and Vicis forced the MDwerks contract upon MSMI at significant cost and disadvantage to

MSMI and at significant economic advantage to MDwerks.

MDwerks profited greatly at MSMI expense because, at Stastney, Phillips and Vicis's direction, MSMI's ability to enforce the MDwerks Contract was an illusion from the outset. The MDwerks Contract technically required MDwerks to act as MSMI's collection agent, and remit amounts collected on the DMS receivables to MSMI. MDwerks was to receive five percent on amounts collected; Global was to receive 15% and MSMI 80%. But the true nature of the MDwerks Contract as orchestrated by Stastney, Phillips and Vicis was that MDwerks would not be required to remit any amounts to MSMI. With the approbation and protection of Stastney, Phillips and Vicis, MDwerks and its President, Howard Katz ("Katz") converted almost all amounts collected on the DMS Receivables to MDwerks' use and padded the MDwerks balance sheet. Despite complaints from MSMI, President, Lowell Fisher ("Fisher") Stastney, Phillips and Vicis employed their corporate control to prevent MSMI from recovering MSMI monies from Katz and MDwerks.

As conflicts between MSMI and MDwerks unfolded and MDwerks continued to DMS collections through Global, Global discovered that approximately 20 percent of the DMS Receivables were based on fraudulent claims. Global alerted MDwerks' chief executive officer, Katz, to the apparent fraud, who, in turn, informed Phillips at Vicis Capital. When Phillips and Katz requested that Global continue collections on the fraudulent claims, Global contacted the Federal Bureau of Investigation ("FBI"), which promptly began an investigation.

As set forth in more detail in the Phillips Federal Criminal Complaint, Plea Agreement & Agreed to Facts, attached as Exhibit A, during the FBI's investigation, Phillips as agent for Stastney, and Vicis instructed certain other defendants, including MSMI's CEO, Fisher, to engage in a knowing and illegal conspiracy to collect the fraudulent DMS Receivables. Fisher complied and involved MSMI in the illegal scheme, thereby breaching his fiduciary and

contractual duties to MSMI. Ultimately, in 2011, Phillips and Katz pleaded guilty to federal conspiracy and health care fraud charges, respectively. Sorat pled guilty to one count of wire fraud as well, but Sorat's indictment and plea remained under seal until its disclosure in early 2012.

Not surprisingly, the damage to MSMI was disastrous. MSMI is a publicly traded company. The first disclosures concerning the FBI's investigation of the illegal scheme and MSMI's involvement destroyed MSMI's business reputation and relationships and caused MSMI's stock to rapidly plunge. Stastney, Fisher, Phillips and Katz resigned from their official positions as MSMI and Vicis Defendant officers and left MSMI to fend for itself without explanation. MSMI's stock never recovered. In addition, a nearly completed proposed merger between MSMI and two other companies was abruptly terminated by one of the other companies. As a result of the defendants' actions, MSMI became toxic to both the business community and investing public and MSMI's market capitalization plunged to nearly zero.

Following public disclosure of the Phillips and Katz plea agreements, MSMI filed an action against all of the named defendants and Sorat. In an egregiously conflicted attempt to protect its own interest at the expense of corporate and minority shareholder interests, Stastney exercised Vices' majority control of MSMI to install Vicis employee Greg Roberts ("Roberts") as MSMI's sole director and officer. Roberts, at Stastney's direction and in purposeful disregard of his obvious fiduciary duties, dismissed all of MSMI's claims against the defendants and Sorat and extinguished MSMI's efforts to obtain restitution for its losses.

As set forth in more detail below, plaintiffs seek damages for defendants' wrongful destruction of MSMI's market value, business opportunities, assets and innocent minority

shareholder's interest.  Plaintiff further seeks damages pursuant to M.G.L. c. 93A as a result of defendants' unfair and deceptive business practices.

## II.     JURISDICTION & VENUE

1.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a), as there is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000.00.

2.     Venue is proper pursuant to 28 U.S.C. § 1391(a), as Massachusetts is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## III.     PARTIES

**The Plaintiff**

3.     The plaintiff, John Hallal, in the Right of and for the Benefit of Medical Solutions Management, Inc., ("MSMI") and individually on behalf of himself and all those minority shareholders similarly situated, is a Massachusetts resident and has been a holder of MSMI's common stock since 2006.

4.     As a current holder of MSMI common stock, and a holder during the period of the wrongs alleged herein, and pursuant to Fed. R. Civ. P. 23.1, plaintiff has standing to assert these claims on behalf of the company and the minority shareholders and will fairly and adequately protect the interests of the Company and those minority stockholders.

**The Defendants**

5.     The defendant, Vicis Capital LLC ("Vicis Capital"), is a limited liability company organized under the laws of the State of Delaware with a principal place of business located at 445 Park Avenue, 16th Floor, New York, New York.

6.     The defendant, Vicis Capital Master Fund Ltd. ("Vicis Fund"), is a series of the Vicis Capital Master Series Trust, a Cayman Islands trust, managed by Vicis Capital LLC, with a principal office located at 445 Park Avenue, 16th Floor, New York, New York. The Vicis Fund and Vicis Capital are also hereinafter referred to as the "Vicis Defendants."

7.     The defendant, Christopher D. Phillips ("Phillips"), is a natural person residing in Tampa, Florida and at all times relevant was a managing director of Vicis Capital.

8.     The defendant, Lowell Fisher, Jr. ("Fisher"), is a natural person residing at 8570 Belle Meade Drive, Fort Myers, Florida, and at all times relevant was MSMI's chief executive officer.

9.     The defendant, Shadron Stastney, ("Stastney") is a natural person residing in Englishtown, New Jersey, is a founding partner and Chief Operating Officer of Vicis Capital and was a director of the nominal defendant, Medical Solutions Management, Inc. At all times relevant to the facts alleged herein, Stastney knew or should have known of the defendants' wrongful conduct described herein.

10.    The defendant, MDWerks, Inc. ("MDWerks") is a Delaware corporation with a principal place of business at Windolph Center, Suite 1, 1020 N.W. 6th Street, Deerfield Beach, Florida.

11.    The defendant, Howard Katz ("Katz") is a natural person residing in the State of Florida. Katz was the chairman of the board, chief executive officer, and founder of MDWerks.

12.    Defendant Greg Roberts is a natural person residing in the state of New York and employee of Vicis Capital and, as of November 16, 2011, has been acting as the sole officer and director of the nominal defendant, Medical Solutions Management, Inc.

**The Nominal Defendant**

13.    The nominal defendant, Medical Solutions Management, Inc. ("MSMI"), is a

Nevada corporation with a former principal place of business located at 237 Cedar Hill Street,

Marlborough, Middlesex County, Massachusetts and a current principal place of business located

at 445 Park Avenue, 19th Floor, New York, New York. (*See* November 21, 2011 Letter of

MSMI's President, Secretary, Treasurer and Sole Director, Greg Roberts, attached hereto as

Exhibit B.)

14.    As of November 16, 2011, Vicis Capital became the controlling officer and

director of MSMI when, as a majority shareholder of MSMI, it voted to remove Director

Marshall Sterman and have him replaced with Greg Roberts, a Vicis Capital employee. (*See*

Exhibit C.)

## IV. **FACTS COMMON TO ALL COUNTS**

15.    The Vicis Fund is a large hedge fund which serves as an investment mechanism

for sophisticated and institutional investors.

16.    Vicis Capital is primarily engaged in the management of the Vicis Fund, and at all

times relevant, was an agent of the Vicis Fund.

17.    Vicis Capital derives substantial performance fees in connection with its

management of the Vicis Fund.

18.    Vicis Capital had a broad mandate to engage the Vicis Fund in diverse investment

strategies, including the funding of reverse mergers.

19.    At all times relevant to this complaint, Shadron Stastney was the Chief Operating

Officer of Vicis Capital with responsibility for overseeing the management of both Vicis Capital

and the Vicis Fund.  At all times relevant to this Complaint Stastney was an agent of both Vicis

8

Capital and the Vicis Fund and directly controlled and supervised the business activities of MSMI.

20.    At the beginning of 2009, the Vicis Defendants had approximately $5 Billion under management.

## A.    THE VICIS FUND GAINS CONTROL OVER MSMI

21.    MSMI began its business life as Orthosupply Management, Inc., ("Orthosupply") a company founded and wholly owned by Massachusetts residents. At all times relevant to this complaint, Orthosupply. maintained its principal offices, employees, officers and business operations in Malboro, Massachusetts.

22.    Orthosupplywas engaged in the marketing, distribution and sale of durable medical equipment to medical providers.

23.    In addition, Orthosupply was also engaged in providing billing services and insurance verification for clients in the health care industry.

24.    Shortly after Orthosupply was founded it contacted Phillips, a principal at New York, based Midtown Partners & Co. LLC ("Midtown Partners"), to explore opportunities for attracting investment capital to MSMI.

25.    On information and belief, the Vicis Defendants had engaged Phillips and Midtown Partners to locate investment opportunities for the Vicis Fund. Vicis had a close and financially substantial relationship with Phillips and Midtown Partners and had invested in over a dozen Midtown Partner deals.

26.    Phillips travelled to Massachusetts and met with the Orthosupply shareholders and officers, and conducted due diligence on the company. Pursuant to this due diligence, Phillips communicated extensively with the Massachusetts shareholders and officers by telephone and

email. As a result of its investigations, Phillips alerted the Vicis Defendants to the opportunity to invest in MSMI.

27.    In or about late 2005, Phillips introduced Stastney and the Vicis Defendants to the Orthosupply shareholders and officers. Stastney travelled to Massachusetts and, with Phillips, directly engaged in extensive negotiations with the Massachusetts Orthosupply shareholders and officers to broker an investment agreement pursuant to which the Vicis Defendants invested approximately $300,000 in MSMI. Besides visiting Orthosupply offices in Massachusetts, Stastney communicated extensively with Orthosupply shareholders and officers by email and telephone regarding the conduct of Orthosupply business.

28.    As a result of negotiations with Stastney, Phillips and the Vicis Defendants, Orthosupply became a publicly-traded company through a reverse merger and, in August of 2006, changed its name to Medical Solutions Management, Inc ("MSMI"). Although MSMI maintained a mailing address in the State of Nevada, at all times relevant to this complaint, MSMI was substantially a Massachusetts company, with all of its offices, equipment, assets (including bank accounts) operational officers and employees located in Malborough, Massachusetts.

29.    An additional term of the agreement obligated the Vicis Defendants to make further investments in MSMI after it became publicly traded.

30.    Midtown Partners received a fee for brokering the Vicis Defendant's investment in MSMI and through its principal Phillips, acted as an agent for the Vicis Defendants in overseeing the Vicis Defendant's investment in MSMI.

31.     Following the merger, the Vicis Defendants continued to invest in, and increase their control over, MSMI through a combination of equity purchases, and convertible debentures and warrants.

32.     As a result of these debt and equity placements, the Vicis Fund became the majority and controlling shareholder of MSMI.

33.     In October of 2007, Vicis Managing Director, Stastney became a member of the MSMI board of directors and communicated extensively with MSMI officers to direct the conduct of MSMI business in Massachusetts.

34.     On or about the fall of 2007, Vicis, through Stastney, hired Phillips and Midtown Partners to assess MSMI business operations in Massachusetts. Phillips and other Midtown Partner employees travelled to Massachusetts to assess MSMI operations and personal.

35.     By the end of 2007, the Vicis Defendants were the beneficial owners of more than 80% of the outstanding shares of MSMI.

36.     In addition to controlling a majority of MSMI stock, Stastney and the Vicis Defendants controlled MSMI finances through their funding of MSMI accounts in Massachusetts. Through their control of MSMI finances, Stastney and the Vicis Defendants controlled MSMI day to day management decisions.

### B.     THE VICIS DEFENDANTS REQUIRE MSMI TO INVEST IN THE DMS RECEIVABLES

37.     In or about February 2007, the Vicis Defendants learned that medical receivables owned by a California company, Deutsche Medical Services, Inc. ("DMS"), were available for sale at a steep discount. DMS was owned and controlled by Sorat.

11

38.     These medical receivables (the "DMS Receivables") concerned billings for medication purportedly administered by physicians to worker's compensation patients in California.

39.     The DMS receivables had a face value of $12 Million and were offered for sale at a price of $8 Million.

40.     Stastney and the Vicis Defendants expected that there would be substantial profit from the anticipated collection of these receivables. On information and belief, Stastney and the Vicis defendants did not know that Sorat and DMS were engaged in a scheme to sell fraudulent medical receivables to MSMI and that the DMS Receivables were in fact substantially fraudulent (*see* Sorat Plea Agreement and Criminal Complaint attached as Exhibit D hereto).

41.     Without conducting appropriate due diligence to determine the collectability or legitimacy of the DMS Receivables, Stastney and the Vicis Defendants directed MSMI to purchase the DMS Receivables.

42.     Stastney and the Vicis Defendants directed MSMI to purchase the DMS Receivables even though MSMI's then-current business was wholly unrelated to any type of collection activity.

43.     Through a series of investment transactions Stastney and the Vicis Defendants provided MSMI with the $8 Million necessary to purchase the DMS Receivables.

44.     With the funds from the Vicis Defendants, MSMI purchased the DMS Receivables through MSMI's wholly-owned subsidiary, OrthoSupply.

45.     In January of 2008, following its investment in the DMS Receivables, Stastney and the Vicis Defendants exercised further control of MSMI and installed defendant Fisher as MSMI President.

12

46. In February of 2008, defendant Christopher Philips became a managing director of Vicis Capital and, as an agent of the Vicis Defendants, exercised day to day control over MSMI business operations. All of MSMI's continual funding requests were submitted to Stastney and Vicis through Phillips and ultimately funded from Vicis to MSMI bank accounts in Massachusetts.

## C.    THE VICIS DEFENDANTS CONTROL THE COLLECTION EFFORTS

47. Initially, Stastney and the Vicis Defendants instructed MSMI to directly collect the DMS Receivables. In order to facilitate this directive, MSMI added significant staff and overhead. Stastney directed MSMI's officers in Massachusetts to expand its offices and hire staff as necessary to collect the DMS receivables. MSMI also hired Global to assist in the collection process.

48. In late 2007, the drain on MSMI overhead prompted Stastney to hire Phillips and Midtown Partners to conduct a review of MSMI operations in Massachusetts. Phillips and other Midtown executives travelled to Massachusetts to meet with MSMI personnel and evaluate operations. Phillips and Stastney concocted a scheme by which Vicis could divert funds from MSMI to MDwerks and inflate MDwerks profits. Stastney directed MSMI director Robert Coffil and MSMI President Brian Lesperance, to transfer of the collections operations to another Vicis controlled company, MDwerks. MDwerks was another company which had recently come under the control of the Vicis Defendants through a series of debt and equity investment transactions also brokered by Midtown Partners.

49. MDwerks was in the business of providing medical claims processing and claims management services for health care providers, and like MSMI, it had no prior business activity

13

related to the medical receivables collection services. MDwerks takeover of the DMS Receivables business was ill received by MSMI Massachusetts staff and minority shareholders as an obvious diversion of MSMI assets to MDwerks that yielded no benefit to MSMI. MDwerks' move into the medical receivable collection business was simply accomplished by hiring Global away from MSMI at the direction of Stastney and Phillips.

50.    Under the collection agreement imposed by Vicis, MDwerks was to receive 5% of the funds collected plus expenses, Global was to receive 15% and MSMI was to receive 80%. In 2007, MSMI President Brian Lesperance resisted the newly imposed relationship with MDwerks and was fired. Stastney replaced Lesperance with Lowell Fisher ("Fisher"), a president hand-picked by Phillips to be more Vicis compliant.

51.    Fisher was made President of MSMI in early 2008. At all times relevant to this complaint Fisher acted at the direction of Stastney and Phillips and was an agent of Stastney, Phillips and Vicis.    At all times relevant to this complaint, Fisher maintained an office in Massachusetts and directed MSMI operations and personnel in Massachusetts.

52.    Phillips was made a Managing Director of Vicis Capital and, at all times relevant to this complaint, acted at Stastney's direction and was an agent of Stastney and the Vicis Defendants. Phillips, along with Stastney, was placed on the board of directors of MDwerks by the Vicis Defendants. Stastney also publically announced that Phillips was to become a member of the MSMI board of directors.

53.    As a newly-hired managing director, Stastney and the Vicis Defendants made Phillips responsible for overseeing the collection of the DMS Receivables. Phillips and Stastney directed this collections business by directing MSMI officers in personnel in Massachusetts. The collections business continued to be problematic as MDwerks and Katz took advantage of this

new opportunity to retain and convert all of the amounts collected on the DMS Recievables to their own use. Despite incessant complaints from Fisher to Phillips, Phillips, Stastney and the Vicis Defendants sanctioned MDwerks' conversion of over $2,000,000 of MSMI funds and according to Fisher, made MSMI "live with it".

## D.   THE VICIS DEFENDANTS INVOLVE MSMI IN THE ILLEGAL INSURANCE FRAUD SCHEME

54.   In the midst of MDwerks' conversion of the DMS Receivables money Global continued to proceed with DMS Receivables collections. At that time, Global's president was Janine Boudreau ("Boudreau").

55.   By the summer of 2008, Global was encountering unusual difficulty in processing the DMS Receivables.

56.   In July 2008, as a result of a brief investigation, Global and Boudreau learned that the low collection rate was due to the fact that a substantial percentage of the DMS Receivables were fraudulent claims in that, in many cases, the underlying medication had never been dispensed.

57.   From said brief investigation, Global and Boudreau learned that approximately 20 percent of the DMS Receivables were fraudulent.

58.   Boudreau promptly informed MDwerks, through its chief executive officer, Katz, of the substantial number of fraudulent receivables.

59.   Katz thereafter consulted with the Vicis Defendants, through Phillips, concerning the fraudulent receivables.

60.   In August 2008, in a personal meeting with Phillips, Katz relayed to the Vicis Defendants that a substantial percentage of the DMS Receivables were fraudulent.

15

61.   Despite their awareness of the fraudulent receivables, the Vicis Defendants made no attempt, nor issued any instruction, to cease the collection efforts but instead began to contemplate the implementation of an illegal scheme to collect fraudulent insurance receivables.

62.   In September 2008, the Vicis defendants consulted with Global regarding the possibility of collecting on fraudulent insurance receivables. As it became clear to Global that it was being asked to perpetrate a fraud, Global, through Boudreau, contacted the Federal Bureau of Investigation ("FBI").

63.   Thus, the FBI began investigating the Vicis Defendants' management of the DMS Receivables through MSMI and MDwerks.

64.   As part of the FBI's investigation, it recorded Boudreau's telephone conversations with Katz, both through the use of a wiretap and a concealed recording device worn by Boudreau.

65.   In October 2008, at the FBI's direction, Boudreau suggested to Katz that Global could implement billing method by which the collection rate of the DMS Receivables could be increased.

66.   This billing method involved adding fraudulent dates of service for services that never occurred (the "Illegal Scheme").

67.   Boudreau, again at the FBI's instruction, informed Katz that Global would require an additional $250,000 payment (a bribe) to carry out the Illegal Scheme.

68.   Katz thereafter consulted with Vicis Defendants to obtain the Vicis Defendants' authorization and payment for the Illegal Scheme.

69.   In October of 2008, the Vicis defendants installed Stastney as a MSMI director.

70.    As Chief Operating Officer of the Vicis Defendants, Stastney knew or should have known of the Illegal Scheme.

71.    In October 2008, Katz met with Phillips at Vicis' offices in New York City and (1) set out in detail the proposed Illegal Scheme and informed the Vicis Defendants' that the collection rate on the DMS Receivables could be substantially increased through its implementation; and (2) advised the Vicis Defendants that additional payment to Global were necessary for said implementation.

72.    At the conclusion of said meeting, the Vicis Defendants, through Phillips, contacted Global and directed it to proceed with the Illegal Scheme.

73.    In November 2008, Phillips, Stastney and the Vicis Defendants, through their control over MSMI, secretly involved MSMI the Illegal Scheme and directed Fisher to employ his MSMI offices in Massachusetts to participate in the scheme.

74.    Specifically, Phillips, on behalf of Vicis, instructed MSMI, through Fisher, to act as an intermediary between Vicis Defendants and Global concerning the execution of the Illegal Scheme.  Knowledge of the Illegal Scheme was hidden from other MSMI officers and the general public.

75.    Fisher complied with the Vicis Defendants' instruction and thereafter relayed communications between the Vicis Defendants and Global concerning the Illegal Scheme.

76.    On or about December 2008, Stastney, Phillips and the Vicis Defendants forwarded $250,000 to MSMI's account in Massachusetts, and instructed Fisher to pay over that amount to Global as a bribe for implementing the Illegal Scheme.

77.    On or about December 31, 2008, Fisher confirmed to the Vicis Defendants that MSMI had paid the bribe to Boudreau as instructed.

17

78.    On or about January 1, 2009, via e-mail, Fisher informed the Vicis Defendants that Global reported that it had completed adding the fraudulent dates of service to the fraudulent claims, and that the claims had been transferred to an out-of-state clearing house which would then forward them to insurance companies for payment. The Illegal Scheme was completed.

79.    Despite their knowledge that the Vicis Defendants had involved MSMI in criminal activity, Fisher and Stastney failed to notify other MSMI officers, directors, shareholders, and general public or otherwise take any proper action.

### E.    THE FBI INVESTIGATION IS DISCLOSED

80.    In early January 2009, Phillips became aware of the FBI investigation.

81.    On or about January 15, 2009, on behalf of the Vicis Defendants, Phillips sent a letter to Fisher at MSMI with the subject line "FBI Investigation." In said letter, Phillips stated as follows:

> …it has come to our attention that the Federal Bureau of Investigation is currently investigating whether certain workers compensation claims being made and/or processed by MDwerks, Inc. and Medical Solutions Management, Inc. are fraudulent. It is our understanding that these claims may have been acquired from, or are somehow related to, Deutsche Medical Services, Inc. An investigation by the FBI is a very serious matter and we hope that Medical Solutions Management treats it as such. As a director and representatives of a large shareholder of Medical Solutions Management, Inc., we strongly urge you to conduct an internal investigation into this matter and to seek the advice of counsel as to what steps Medical Solutions Management should take so that the company and its directors and employees do not engage in any wrong-doing.

82.    On January 27, 2009 Fisher resigned as CEO, and on January 28, 2009 Stastney resigned from the board of directors.

83.    In its SEC Form 8-K dated February 2, 2009, MSMI first disclosed the FBI investigation by stating that Fisher was resigning and that his reasons for resignation included his "awareness of an ongoing federal investigation" involving the company.

84.    MDWerks followed suit and disclosed the FBI investigation in its own SEC filings

wherein it stated that it:

> ...had been informed that there is an ongoing investigation involving certain worker
> compensation claims which may involve Medical Solutions Management, Inc. a former
> client of MDwerks, Inc.  MDwerks provided support services to [Medical Solutions] in
> connection with the collection of certain accounts of [Medical Solutions], including
> claims which could be the subject of the grand jury investigation.

### F.    THE PLUNGE OF MSMI STOCK

85.    As of January 1, 2009, MSMI was a publicly traded company.

86.    At that time, there were approximately 97 Million issued and outstanding shares of

MSMI stock.

87.    During the months that the defendants were conspiring and carrying out the Illegal

Scheme, and right up until the time that the FBI investigation was publicly disclosed on February

2, 2009, MSMI stock consistently traded at or around $.20 per share.

88.    Within days following the February 2, 2009 disclosure MSMI stock plunged

approximately 70% and ultimately to one cent ($.01) per share on the public markets and never

recovered.

### G.    AS A RESULT OF THE CRIMINAL SCHEME THIRD PARTIES CEASE DOING BUSINESS WITH MSMI.

89.    Shortly following public disclosure of Defendants' criminal scheme, third party

customers and vendors avoided doing business with MSMI due to the allegations of criminality

and MSMI income plummeted.

### H.    PHILLIPS AND KATZ PLEAD GUILTY TO FEDERAL CRIMES

90.    On or about January 12, 2010, the United States, through its Department of Justice,

filed a one-count Information under seal in the United States District Court in Hampshire

against Phillips charging him with Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. §§ 371, 1343 as a result of his involvement in the Illegal Scheme. (*See* United States v. Christopher Phillips, # 1:10-cr-00002-PB-1 attached hereto as Exhibit A).

91.     On or about January 19, 2010, Phillips pleaded guilty to the federal conspiracy charge, and admitted that he committed conspiracy to commit wire fraud in violation of 18 U.S.C. § 371, and that he committed an overt act in furtherance of the conspiracy by wiring funds to pay for the costs associated with executing the Illegal Scheme.

92.     On or about December 10, 2008, the United States, through its Department of Justice, filed a one-count Information under seal in the United States District Court in Hampshire against Katz charging him with Health Care Fraud in violation of 18 U.S.C. § 1347. (*See* United States v. Howard Katz, # 1:08-cr-00159-SM attached hereto as Exhibit E).

93.     On or about April 4, 2010, Katz pleaded guilty to said Health Care Fraud charge.

94.     As part of his plea agreement, Katz agreed to a sentence that included weekend confinement.

### I.     MDWERKS, STASTNEY, PHILLIPS, VICIS AND KATZ UNLAWFULLY CONVERT THE NON-FRAUDULENT COLLECTED RECEIVABLES

95.     On information and belief, a substantial portion of the DMS Receivables were valid claims.

96.     Upon information and belief, MDwerks and/or Katz has collected approximately $5 Million in connection with the valid DMS Receivables.

97.     However, MDwerks and/or Katz have failed to remit any amount of the collected proceeds to MSMI as required by its collection agreement with MSMI.

98.   In addition, in or about April 2011, MSMI discovered that approximately $2 Million of the valid DMS Receivables were collected by MDwerks and/or Katz and a substantial portion of the proceeds were deposited into a personal bank account that Katz maintains overseas.

99.   Katz and MDwerks have failed to remit to MSMI any portion the $2 Million that was unlawfully converted and deposited in Katz' personal bank account.

100.  Katz and Mdwerks conversion of MSMI monies was directed, approved and sanctioned by Phillips, Stastney and Vicis.

101.  Plaintiffs were grievously harmed by the conversion by Katz, Mdwerks, Phillips, Stastney and Vicis.

## V.      DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS

102.  Plaintiff brings this action derivatively in the right of and for the benefit of MSMI to redress injuries suffered by MSMI as a direct result of the negligent, wrongful and otherwise injurious actions alleged herein.  MSMI is named as a nominal defendant solely in a derivative capacity.

103.  Plaintiff will adequately and fairly represent the interest of MSMI in enforcing and prosecuting its rights.

104.  Plaintiff is and has continuously been an owner of MSMI common stock during the wrongful conduct alleged herein.

105.  Plaintiff did not make demand on the Board of Directors of MSMI to bring this action on behalf of MSMI because such demand would have been a futile, wasteful and useless act for the following reasons:

a.    Up until November 16, 2011, Marshall Sterman ("Sterman") was the sole officer and director of MSMI.

b.    In fall 2011, Sterman authorized a lawsuit to be filed directly by MSMI against the defendants named herein, including the Vicis defendants, who are a majority shareholder of MSMI stock

c.    On November 3, 2011, an action entitled *Medical Solutions Management, Inc. v. Vicis Capital, LLC, et al.* was filed in the United States District Court for the District of Massachusetts, and the case was assigned docket No.: 1:11-cv-11949-DPW (hereinafter Referred to as the "Vicis Action.") (*See* Docket Sheet, attached hereto as <u>Exhibit F</u>.)

d.    The defendants named herein, On Vicis Capital Master Fund Ltd.,Vicis Capital, LLC, Christopher D. Phillips, Lowell Fisher, Jr., Shadron Stastney, Mdwerks, Inc. and Howard Katz, were all named defendants in the Vicis Action.

e.    Prior to being served with the complaint in the Vicis Action, the Vicis Defendants, which represented more than two-thirds (2/3) of MSMI's voting equity, became aware of the Vicis Action and on November 16, 2011 took Action by Written Consent of the Shareholders in Lieu of a Special Meeting and adopted the following resolutions:

    (1) To replace the current Board of Directors (consisting solely of Marshall Sterman) with "individuals who will act in [MSMI]'s best interests";

    (2) Remove Marshall Sterman from office and direct that he has no "authority in any respect or capacity to act for or on behalf of [MSMI]"; and

    (3) Elect and appoint Greg Roberts as the sole officer and Director of MSMI.

(*See* Action by Written Consent of the Shareholders in Lieu of a Special Meeting, attached hereto as <u>Exhibit C</u>.)

f.   At the time of his appointment as Director of MSMI, Greg Roberts was an employee

of the Vicis defendants. (*See* November 21, 2011 Letter from Roberts written on Vicis

letterhead, attached hereto as Exhibit B.)

g.   As his first act of business as the Sole Director of MSMI, Greg Roberts adopted the

resolutions supported by the Vicis defendants and he was named President, Secretary and

Treasurer of MSMI.  (*See* Action of Sole Director in Lieu of a Special Meeting, attached

hereto as Exhibit C.)

h.   On or about November 16, 2011, counsel for the Vicis Defendants, acting on behalf

of the newly elected officer of MSMI, Greg Roberts, served Marshall Sterman with

notice of his removal.

i.   On November 21, 2011, Greg Roberts, acting in his capacity as MSMI's President,

Secretary, Treasurer and Sole Director, drafted letters to counsel of record for MSMI,

Orestes G. Brown and Jan R. Schlichtmann, demanding that they voluntarily dismiss the

Vicis Action against the Vicis and other defendants.  (*See* Exhibit B; *see also* letter to

Attorney Schlichtmann, attached hereto as Exhibit G.)[1]

j.   Attorneys Schlichtmann and Brown informed Greg Roberts that they could not

dismiss the matter as instructed.

k.   Attorneys Schlichtmann and Brown were terminated by Roberts as counsel for

MSMI.

---

[1]Additionally, Roberts also demanded that Attorneys Schlichtmann and Brown dismiss a second action brought by MSMI's subsidiary, Orthosupply Management, Inc. against defendants Life Pharmaceuticals Management Group, Inc., Sirious Sorat, Deutsche Medical Services, Inc. and Thomas Van Auken. That action, 1:11-cv-11963-DPW, was also brought in the United States District Court for the District of Massachusetts.  (*See* Docket Sheet, attached hereto as Exhibit H.) (hereinafter referred to as the Deutsche Medical Action.)

l.    Thereafter, Roberts hired Attorney Richard E. Heifetz as counsel for MSMI and he

filed his appearance on November 28, 2011. (*See* Exhibit F at entry No. 4.)

m.    Attorneys Brown and Schlichtmann filed their notices of withdrawal on November

28 and 29, 2011, respectively. (*See* Exhibit F at entry Nos. 5-7.)

n.    On November 29, 2011, Attorney Heifetz filed a notice of voluntary dismissal on

behalf of MSMI. (*See* Exhibit F at entry No. 8.)

o.    Insofar as the Vicis defendants used their majority position to effect the removal of

Sterman and appointment of Greg Roberts for the sole purpose of killing the Vicis

Action, any request to file suit made to Greg Roberts – MSMI's current President,

Secretary, Treasurer and Sole Director – would have been a futile, wasteful and useless

## COUNT I

**(Breach of Fiduciary Duty – Fisher, Phillips, Vicis Defendants, MDwerks & Katz)**

106.    The plaintiff restates and realleges the allegations contained in the foregoing

paragraphs and incorporates them herein by reference.

107.    As the chief executive officer of MSMI, Fisher owed fiduciary duties of loyalty,

care, and utmost good faith and fair dealing to MSMI and its minority shareholders.

108.    As a defacto officer of MSMI and officer of MSMI controlling shareholder,

Phillips owed fiduciary duties of loyalty, care, and utmost good faith and fair dealing to MSMI

and its minority shareholders.

109.    As controlling shareholders and officers, the Vicis Defendants owed fiduciary

duties of loyalty, care, and utmost good faith and fair dealing to MSMI and its minority

shareholders.

110. As agents of MSMI, MDwerks and Katz owed fiduciary duties of loyalty, care, and utmost good faith and fair dealing to MSMI and its minority shareholders.

111. The defendants Phillips, Vicis Capital, the Vicis Fund, Katz, and MDwerks entered into a conspiracy to carry out the illegal insurance fraud scheme.

112. Fisher, Phillips, the Vicis Defendants, Katz and Mdwerks knew, or should have known, that said insurance fraud scheme was illegal.

113. The aforesaid decisions and actions of Fisher, Phillips the Vicis Defendants, Katz and MDwerks were in breach of their fiduciary duties owed to MSMI.

114. As a direct and proximate cause of the breach of fiduciary duties of Fisher, Stastney, the Vicis defendants, Katz and MDwerks, the plaintiffs suffered grievous harm.


### COUNT II

**(Aiding & Abetting/Civil Conspiracy to Commit Breach of Fiduciary Duty and Aid & Abetting/Civil Conspiracy to Convert– Phillips, Stastney, Fisher, Katz, Vicis Fund, Vicis Capital, and MDwerks)**

115. The plaintiff restates and realleges the allegations contained in the foregoing paragraphs and incorporates them herein by reference.

116. The Vicis Defendants, Stastney, Phillips, Fisher, MDwerks and Katz entered into an agreement to carry out the illegal insurance fraud scheme and to convert MSMI assets.

117. Fisher's, Phillip's, Stastney's, the Vicis Defendants', Katz's and MDwerks' agreement to, and participation in, the illegal insurance fraud scheme and conversion scheme represented a breach of their fiduciary duties owed to MSMI and its minority shareholders.

118. Phillips, Stastney, Fisher, Katz, MDwerks, the Vicis Defendants' knew that both insurance fraud scheme and conversion scheme was unlawful and participation therein

represented a breach of the fiduciary duty the Defendants owed to MSMI and its minority shareholders.

119.  Phillips, Stastney, Fisher, Katz, MDwerks and the Vicis Defendants aided and abetted the several officers' breach of fiduciary duty in perpetrating the illegal insurance fraud and conversion scheme.

120.  As a result of the defendants' conduct, plaintiffs suffered grievous harm.

### COUNT III

**(Breach of Fiduciary Duty/Violation of M.G.L. c. 93A – Vicis Fund, Vicis Capital, Stastney & Greg Roberts)**

121.  The plaintiff restates and realleges its allegations contained in the foregoing paragraphs and incorporates them herein by reference.

122.  Following the filing of the Vicis Action, Stastney and the Vicis Defendants, representing 2/3 of the voting shares of MSMI, voted to remove Marshall Sterman as the sole Officer and Director of MSMI.

123.  Following the vote to remove Sterman, Stastney and the Vicis Defendants, voted to install as the sole Officer and Director of MSMI its own employee, Greg Roberts.

124.  At all times relevant to this Count III, Shadron Stastney was the Chief Operating Officer of the Vicis Defendants with direct control over Greg Roberts.

125.  As his first act of business as the Sole Director of MSMI, and at the direction of Stastney and the Vicis Defendants, Greg Roberts adopted the resolutions supported by the Vicis defendants and he was named President, Secretary and Treasurer of MSMI.  (*See* Exhibit ????.)

126.    On or about November 16, 2011, counsel for the Vicis Defendants, acting on

behalf of the newly elected officer of MSMI, Greg Roberts, Stastney and the Vicis Defendants,

served Marshall Sterman with notice of his removal.

127.    On November 21, 2011, Greg Roberts, at Stastney's and the Vicis Defendants'

direction, and acting in his capacity as MSMI's President, and, Secretary, Treasurer and Sole

Director, drafted letters to counsel of record for MSMI, Orestes G. Brown and Jan R.

Schlichtmann, demanding that they voluntarily dismiss the Vicis Action and the Deutsche

Medical Action.  (*See* Exhibits A & E "????J-K.)

128.    Immediately thereafter, Attorneys Schlichtmann and Brown were terminated by

Roberts as counsel for MSMI.

129.    Thereafter, Roberts, at Stastney's and the Vicis Defendants' direction, hired

Attorney Richard E. Heifetz as counsel for MSMI and he filed his appearance on November 28,

2011.  (*See* Exhibit F at entry No. 4.)

130.    Attorneys Brown and Schlichtmann filed their notices of withdrawal on November

28 and 29, 2011, respectively. (*See* Exhibit F at entry Nos. 5-7.)

131.    On November 29, 2011, at the Direction of Roberts, Stastney and the Vicis

Defendants, Attorney Heifetz filed a notice of voluntary dismissal on behalf of MSMI.  (*See*

Exhibit F at entry No. 8.)

132.    Because Roberts was a Vicis Defendant employee, the Vicis Defendants were the

defacto officers and directors of MSMI when Roberts ordered dismissal of the Vicis Action.

133.    As the sole officer and director of MSMI, and the controlling majority shareholder,

Roberts owed fiduciary duties of loyalty, care, and utmost good faith and fair dealing to MSMI

and its minority shareholders.

134.  As the defacto sole officers and directors of MSMI, Stastney and the Vicis
Defendants owed fiduciary duties of loyalty, care, and utmost good faith and fair dealing to
MSMI and its minority shareholders.

135.  As controlling shareholders and officers, the Vicis Defendants and Stastney owed
fiduciary duties of loyalty, care, and utmost good faith and fair dealing to MSMI and its minority
shareholders.

136.  The Vicis Action and Deutsche Medical Action were in the best interests of MSMI
and represented a significant opportunity to recover damages for substantial wrongs.

137.  Roberts, Stastney and the Vicis Defendants were in clear conflict of interest and in
breach of their fiduciary duties when they dismissed the Vicis Action and Deutsche Medical
Action.

138.  Stastney's, Roberts' and the Vicis Defendants' self-interested dismissals of the
Vicis Action and Deutsche Medical Action were unfair business practices.

139.  As a direct and proximate cause of the breach of fiduciary duties of Roberts,
Stastney and the Vicis Defendants, the plaintiffs has suffered grievous harm.

140.  As a result of Roberts. Stasney's and the Vicis Defendants' unfair business
practices, the Plaintiffs suffered grievous harm.


## COUNT IV

**(Breach of Contract – Fisher, Phillips Katz, MDwerks and the Vicis Defendants)**

141.  The plaintiff restates and realleges its allegations contained in the foregoing
paragraphs and incorporates them herein by reference.

142.  MSMI had a contractual relationship with Katz and MDwerks, respectively.

143.     MDwerks was pervasively controlled by the Stastney, Phillips and the Vicis Defendants.

144.     Stastney, Phillips, the Vicis Defendants , Katz and MDwerks breached their contract with MSMI through their participation in the insurance fraud scheme and through conversion of MSMI assets to Katz and MDwerks use.

145.     As a result of the defendants' conduct, plaintiffs suffered grievous harm.

## COUNT V

### (Breach of the Implied Covenant of Good Faith and Fair Dealing – Fisher, Phillips, Katz, MDwerks and the Vicis Defendants)

146.     The plaintiff restates and realleges its allegations contained in the foregoing paragraphs and incorporates them herein by reference.

147.     MSMI had a contractual relationship with the defendant Katz and MDwerks, respectively.

148.     Inherent in every contract is the implied covenant of good faith and fair dealing.

149.     MDwerks was pervasively controlled by Stastney, Phillips, and the Vicis Defendants.

150.     Stastney, Phillips, the Vicis defendants, Katz and MDwerks breached the implied covenant of good faith and fair dealing through their participation in the insurance fraud scheme and the diversion of MSMI assets to MDwerks.

151.     As a result of the defendant 'conduct, plaintiffs suffered grievous harm.

## COUNT VI

### (Interference with Contractual Relations – The Vicis Fund, Vicis, Stastney and Phillips)

152.    The plaintiff restates and realleges their allegations contained in the foregoing paragraphs and incorporates them herein by reference.

153.    Stastney, The Vicis Fund, Vicis Capital, and Phillips were fully aware that MSMI had a contractual relationship with MDwerks.

154.    Stastney, The Vicis Fund, Vicis Capital, and Phillips interfered with said contractual relationships by intentionally causing their agents, Katz and MDwerks, to intentionally breach their contracts with MSMI.

155.    The interference with the relationships by Stastney, the Vicis Fund, Vicis, and Phillips, in addition to being intentional, was improper in motive and/or means.

156.    As a result of said intentional interference, the plaintiff suffered grievous harm.

## COUNT VII

### (Interference with Advantageous Business Relations – The Vicis Fund, Vicis, Katz, Phillips and MDWerks)

157.    The plaintiff restates and realleges its allegations contained in the foregoing paragraphs and incorporates them herein by reference.

158.    Fisher, Phillips, the Vicis defendants, Katz and MDwerks knew that MSMI had an advantageous relationship with a multitude of third party businesses.

159.    Fisher, Phillips, the Vicis defendants, Katz and MDwerks knowingly induced a breaking of said relationship.

160.    The interference with MSMI business relationships by Fisher, Phillips, the Vicis defendants, Katz and MDwerks, in addition to being intentional, was improper in motive and/or means.

161.    As a result of said interference, the plaintiffs suffered grievous harm.

## COUNT VIII

**(Negligence/Breach of Fiduciary Duty – Phillips, Fisher, Stastney, The Vicis Fund, Vicis Capital, MDwerks & Katz)**

162.    The plaintiff restates and realleges its allegations contained in the foregoing paragraphs.

163.    At all times relevant, Fisher, Phillips, the Vicis Defendants & Stastney were either actual of defacto officers and/or directors of MSMI.

164.    At all times relevant, Phillips, Stastney and the Vicis Defendants were majority shareholders of MSMI exercising pervasive direct control over the daily operations of MSMI.

165.    As officers and/or directors, or controlling shareholders, Phillips, Stastney, the Vicis Defendants and Fisher owed MSMI and its minority shareholders a fiduciary duty and a duty of care to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances.

166.    At minimum, this duty of care included, but was not limited to the obligations:

    a.    To adopt such careful, reasonable and prudent policies and procedures, including, but not limited to, those related to the collection of receivables, as required to ensure that MSMI did not engage in unsafe and unsound practices, and to ensure that the affairs of MSMI were conducted in accordance with these policies and procedures;

    b.    To communicate to MSMI's officers, directors and employees a clear expectation that they must adhere to sound collection policies by careful monitoring of directors', officers' and employees' conduct;

    c.    Upon receiving notice of an unsafe or unsound practice, to make a reasonable investigation thereof and to exercise reasonable business judgment with respect to all facts that a reasonable investigation would have disclosed; and

    d.    To conduct MSMI's business in compliance applicable law.

167.    As agents of MSMI, MDwerks and Katz owed MSMI and its minority shareholders a duty of care to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances. At minimum, this duty of care included, but was not limited to the obligations set forth in paragraphs 161 and 162 above.

168.    Fisher, Phillips, the Vicis Defendants and Stastney breached their duties and were negligent by, among other things:

    a.    Failing to adopt such careful, reasonable and prudent policies and procedures, including, but not limited to, those related to the collection of receivables, as required to ensure that MSMI did not engage in unsafe and unsound practices, and to ensure that the affairs of MSMI were conducted in accordance with these policies and procedures;

    b.    Failing to communicate to MSMI's officers, directors and employees a clear expectation that they must adhere to sound collection policies by careful monitoring of directors', officers' and employees' conduct;

    c.    Upon receiving notice of an unsafe or unsound practice, failing to make a reasonable investigation thereof and to exercise reasonable business judgment with respect to all facts that a reasonable investigation would have disclosed; and

    d.    Failing to conduct MSMI's business in compliance applicable law.

169.    Phillips and the Vicis Defendants breached their duties and were negligent by, among other things, the failure set forth in paragraphs 163 above.

170.    MDwerks and Katz breached their fiduciary duties and were negligent by, among other things, the failures set forth in paragraphs 163 above.

171.    As a direct and proximate result of the defendants' breach of fiduciary duty and their negligence, the plaintiff suffered damages in an amount to be proven at trial.

## COUNT IX

### (Conversion – Katz)

172.    The plaintiff restates and realleges its allegations contained in the foregoing paragraphs.

173.    Upon information and belief, Katz has collected at least approximately $5 Million in connection with the non-fraudulent DMS Receivables.

174.    Upon information and belief, at least approximately $2 Million of the non-fraudulent DMS Receivables were collected by Katz and deposited into a personal bank account that Katz maintains overseas.

175.    Katz has failed to remit any amount of the collected proceeds to MSMI as required by the collection agreement with MSMI.

176.    As a result of the defendants conduct, plaintiffs have suffered grievous harm.

## COUNT X

### (Violation of M.G.L. c. 93A, § 2 *et seq.* – Vicis Fund, Vicis Capital, Phillips and Fisher)

177.    The plaintiff restates and realleges the allegations contained in the foregoing paragraphs and incorporates them herein by reference.

178. Defendants were engaged in trade or commerce in Massachusetts for purposes of M.G.L. c. 93A, § 2, *et seq.*

179. The Vicis Fund and Vicis Capital installed Fisher as chief executive officer of MSMI.

180. The Vicis Fund and Vicis Capital installed Stastney as a member of MSMI's board of directors.

181. The Vicis Defendants authorized Phillips to exercise defacto control over MSMI.

182. Fisher and Phillips were agents of the Vicis Fund and Vicis Capital.

183. Fisher had a contractual relationship with MSMI.

184. Fisher and Phillips knew, or should have known, that the insurance fraud scheme was illegal and represented a breach of their contractual and fiduciary duties to MSMI.

185. The Vicis Fund, Vicis Capital, and Phillips knew that the insurance fraud scheme was illegal and represented a breach of Fisher's contractual and fiduciary duties to MSMI.

186. MDwerks and Katz knew that the insurance fraud scheme was illegal and represented a breach of Fisher's contractual and fiduciary duties to MSMI.

187. The Vicis Fund, Vicis Capital, and Phillips instructed Fisher and MSMI to participate in the insurance fraud scheme and thereby caused Fisher to 1) breach his contractual and fiduciary duties, and 2) breach the implied covenant of good faith and fair dealing.

188. The Vicis Fund, Vicis Capital, Phillips, Fisher, and Katz entered into an agreement to carry out the insurance fraud scheme.

189. The actions of the defendants constitute unfair or deceptive acts or practices made unlawful by M.G.L. c. 93A, § 2, *et seq.*

190. As a result of the defendants conduct, plaintiffs have suffered grievous harm.

## COUNT XI

### (Violation of M.G.L. c. 93A, § 2 *et seq.* – Katz)

191.   The plaintiff restates and realleges the allegations contained in the foregoing paragraphs and incorporate them herein by reference.

192.   Defendants were engaged in trade or commerce in Massachusetts for purposes of M.G.L. c. 93A, § 2, *et seq.*

193.   Katz knew, or should have known, that Fisher and Stastney had respective contractual and fiduciary relationships with MSMI.

194.   As an agent of MSMI, Katz owed fiduciary duties of loyalty, care, and utmost good faith and fair dealing to MSMI.

195.   Katz knew that the insurance fraud scheme was illegal and represented a breach of Fisher's and Stastney's respective contractual and fiduciary duties to MSMI.

196.   Katz entered into an agreement with Vicis Fund, Vicis Capital, Phillips, Stastney, and Fisher, to carry out the insurance fraud scheme.

197.   Upon information and belief, Katz has collected approximately $5 Million in connection with the valid DMS Receivables.

198.   Upon information and belief, approximately $2 Million of the valid DMS Receivables were collected by MDwerks and/or Katz and deposited into a personal account that Katz maintains overseas.

199.   Katz has failed to remit any amount of the collected proceeds to MSMI as required by its collection agreement with MSMI.

200.   Katz's actions constitute unfair or deceptive acts or practices made unlawful by M.G.L. c. 93A, § 2, *et seq.*

201.  As a result of the Katz's conduct, plaintiffs have suffered grievous harm.

Wherefore, Plaintiffs respectfully demand:

1.      As to Counts I, II, III, IV, V, VI, VII, VIII & IX that the Court enter judgment for the plaintiff and against the defendants jointly and severally in an amount to be determined in a trial;

2.      As to Count X & XI that the Court determine that the actions of defendants constitute deceptive acts or practices made unlawful by M.G.L. c. 93A, § 2, *et seq.* and award to the plaintiff its costs, attorney's fees, and up to treble its actual damages; and

3.      That the Court award such other relief to plaintiff as it deems just and proper.

## JURY CLAIM

The plaintiff, John Hallal, in the Right of and for the Benefit of Medical Solutions

Management, Inc., individually and on behalf of all other minority shareholders similarly

situated, claims a trial by jury on all issues so triable.

> Respectfully submitted,
> JOHN HALLAL, in the Right of and for the Benefit
> of Medical Solutions Management, Inc.,
> individually and on behalf of all other minority
> shareholders similarly situated,
> By his attorneys,
>
> */s/ Orestes G. Brown*
> Orestes G. Brown (BBO #566431)
> Keith L. Sachs (BBO #634025)
> METAXAS BROWN PIDGEON LLP
> 900 Cummings Center, Suite 207T
> Beverly, MA  01915
> 978-927-8000
> obrown@metaxasbrown.com
> ksachs@metaxasbrown.com
>
> */s/Jan R. Schlichtmann*

Dated:  January 27, 2012

> Jan R. Schlichtmann (BBO #445900)
> P.O. Box 233
> Prides Crossing, MA  01965
> 978-927-1037
> jan@schlichtmannlaw.com

### VERIFICATION

Plaintiff John Hallal, by and through his attorneys, derivatively on behalf of Medical Solutions Management, Inc., alleges upon personal knowledge as to himself and his own acts, and upon *information and belief* as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, interviews of MSMI employees and officers, a review of MSMI emails, a review of the books and records of MSMI, Securities and Exchange Commission filings, news reports, press releases and other publicly available documents regarding the parties, the facts contained in the Verified Complaint.

> /S/ John Hallal
> John Hallal

## CERTIFICATE OF ELECTRONIC SERVICE

I, Keith L. Sachs, do hereby certify that a copy of this "AMENDED COMPLAINT" was served on all counsel for the Defendants by electronic service in accordance with the Court's rules and procedures regarding such service.

Dated: May 18, 2012

/S/ *Keith L. Sachs*, Esq.
Keith L. Sachs, Esq.