UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                      )
JOHN HALLAL, individually, on behalf      )
of himself and all other minority shareholders)
similarly situated and in the Right of and for )
the Benefit of Medical Solutions                )
Management, Inc.                                    )
                                                      )
                    Plaintiff,                         )
                                                      )
                    v.                                 )        Civil Action No. 12-10166-NMG
                                                      )
VICIS CAPITAL MASTER FUND LTD,       )
VICIS CAPITAL, LLC, CHRISTOPHER       )
D. PHILLIPS, LOWELL FISHER, JR.,         )
SHADRON STASTNEY, MDWERKS, INC.)
HOWARD KATZ, and GREG ROBERTS       )
                                                      )
                    Defendants.,                     )
                                                      )
MEDICAL SOLUTIONS MANAGEMENT, )
INC.                                                    )
                    Nominal Defendant               )
_____ )

**REPORT AND RECOMMENDATION ON DEFENDANTS GREG ROBERTS, SHADRON STASTNEY, VICIS CAPITAL MASTER FUND LTD., VICIS CAPITAL, LLC, AND CHRISTOPHER PHILLIPS MOTIONS TO DISMISS THE VERIFIED DERIVATIVE SHAREHOLDER AMENDED COMPLAINT**

(Docket Nos. 43, 45, 47)

February 25, 2013

Boal, M.J.

        Plaintiff John Hallal ("Hallal") brings this shareholder derivative suit on behalf of

himself and all other minority shareholders similarly situated, and also for the benefit of Medical

Solutions Management, Inc. ("MSMI"), against Vicis Capital Master Fund Ltd., Vicis Capital,

LLC, Christopher Phillips, Lowell Fisher, Jr., Sharon Stastney, MDwerks, Inc., Howard Katz, and Greg Roberts.[1]  Docket No. 29.  Hallal alleges that the Defendants involved MSMI in an insurance fraud scheme that resulted in an FBI investigation of MSMI, the disclosure of which drove MSMI's stock to .01 cent.  Vicis Capital Master Fund Ltd., Vicis Capital, LLC, Shadron Stastney ("Stastney"), Christopher Phillips ("Phillips"), and Greg Roberts ("Roberts")[2] have filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6) for lack of personal jurisdiction and failure to state a claim, respectively.  Docket Nos. 43, 45, 47.  For the foregoing reasons, this Court recommends that the District Court grant Roberts' motion to dismiss (Docket No. 43), and grant in part and deny in part the motions to dismiss by Phillips, Stastney, and the Vicis Defendants (Docket Nos. 45, 47).[3]

---

[1]  MSMI is sued as a nominal defendant.  "In a derivative action, suit is brought on behalf of a corporation, by its shareholders. The defendants are generally corporate officers and directors, as well as the corporation itself.  However, the corporation is merely a 'nominal' defendant, and in fact stands to receive a substantial benefit if the plaintiffs/shareholders are successful.  Thus, the corporation is in the anomalous position of being both a plaintiff and a defendant."  Musheno v. Gensemer, 897 F. Supp. 833, 835 (M.D. Pa. 1995) (internal citation omitted).

[2]  MSMI and Fisher have answered the Amended Complaint.  Docket Nos. 38, 42.  Katz filed a suggestion of bankruptcy on April 16, 2012.  Docket No. 19.  MDwerks has not responded to the Amended Complaint.

[3]  The District Court referred these motions to the undersigned for a report and recommendation.  Docket July 2, 2012, July 3, 2012, July 10, 2012.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**[4]

A.      The Parties

Hallal is a Massachusetts resident who has held MSMI common stock since 2006. Amended Complaint ("AC"), ¶ 3.  Vicis Capital, LLC ("Vicis Capital") is a limited liability company organized under the laws of the State of Delaware with a principal place of business located in New York, New York.  AC ¶ 5.  Vicis Capital Master Fund Ltd. ("Vicis Fund") is a hedge fund managed by Vicis Capital, LLC with a principal office located in New York, New York.  AC ¶¶ 6, 15.

Phillips resides in Tampa, Florida and was a managing director of Vicis Capital.  AC ¶ 7.

Lowell Fisher, Jr. ("Fisher") resides in Fort Myers, Florida, and was MSMI's chief executive officer.  AC ¶ 8.  Stastney, a New Jersey resident, is a founding partner and Chief Operating Officer of Vicis Capital and was a director of MSMI.  AC ¶ 9.  At times relevant to the Amended Complaint, Stastney was responsible for overseeing the management of Vicis Capital and the Vicis Fund.  AC ¶ 19.  MDwerks, Inc. ("MDwerks") is a Delaware corporation with a principal place of business in Deerfield Beach, Florida.  AC ¶ 10.  Howard Katz ("Katz"), a Florida resident, was the chairman of the board, chief executive officer, and founder of MDwerks.  AC ¶ 11.  Greg Roberts, a New York resident, is an employee of Vicis Capital and is the sole officer and director of MSMI.  AC ¶ 12.

---

[4]    The facts are derived from the Amended Complaint.  The Court takes as true all well-pleaded allegations and draws all reasonable inferences in Hallal's favor.  See Morales-Tañon v. Puerto Rico Electric Power Authority, 524 F.3d 15, 17 (1st Cir. 2008).

B.      The Beginning Of MSMI's Relationship With The Vicis Defendants[5] And
        Phillips

MSMI began as Orthosupply Management, Inc., ("Orthosupply") a company that

marketed, distributed and sold durable medical equipment and provided billing services and

insurance verification.  AC ¶¶ 22-23.  Orthosupply maintained its principal offices, employees,

officers and business operations in Marlboro, Massachusetts.  AC ¶ 21.  Orthosupply contacted

Phillips, then a principal at New York based Midtown Partners & Co. LLC ("Midtown

Partners"), to explore opportunities for attracting investment capital to Orthosupply.  AC ¶ 24.

At the same time, the Vicis Defendants engaged Phillips and Midtown Partners to locate

investment opportunities for the Vicis Fund.  AC ¶ 25.

In or about late 2005, Phillips introduced Stastney and the Vicis Defendants to

Orthosupply's shareholders and officers.  AC ¶ 27.  Stastney and Phillips brokered an investment

agreement with Orthosupply shareholders and officers pursuant to which the Vicis Defendants

invested approximately $300,000 in MSMI.  Id.  As a result of negotiations, Orthosupply became

a publicly-traded company and, in an August 2006 reverse merger,[6] changed its name to Medical

Solutions Management, Inc.  AC ¶ 28.  A term of the agreement obligated the Vicis Defendants

---

[5] In their submissions, the parties do not differentiate between Vicis Capital Master
Fund, Ltd. and Vicis Capital, LLC and refer to them collectively as the "Vicis Defendants."
Although the Vicis Defendants state that Vicis Capital has no ownership interest in the Vicis
Fund, see Docket No. 46, p. 9 n. 5, they do not argue this distinction as a basis for dismissal.
Accordingly, the Court will also refer to Vicis Capital and Vicis Fund collectively as the Vicis
Defendants.

[6] "A 'reverse merger' . . . . is a transaction in which a private operating corporation (a
'private' company) merges into a corporation whose stock has previously been offered to the
public (a 'public' company)."  In re Fibercore, Inc., 391 B.R. 647, 651 n. 5 (Bankr. D. Mass.
2008).

to make further investments in MSMI after it became publicly traded.  AC ¶ 29.  Midtown

Partners received a fee for brokering the Vicis Defendant's investment in MSMI and Phillips

acted as an agent for the Vicis Defendants in overseeing their investment in MSMI.  AC ¶ 30.

      C.     The Vicis Defendants Acquire A Majority Interest In MSMI

Throughout 2006 and 2007, the Vicis Fund steadily acquired a majority stake in MSMI

through a combination of equity purchases, convertible debentures and warrants.  AC ¶¶ 31-32.

By the end of 2007, the Vicis Defendants had acquired almost 80% of MSMI common stock and

voting control.  AC ¶ 35.  Hallal alleges that at all times relevant to the amended complaint, the

Vicis Defendants controlled a majority of MSMI voting stock, directly controlled MSMI

finances, and controlled major MSMI management decisions.  AC ¶ 36.

      D.     MSMI's Purchase Of Medical Receivables

In or about February 2007, the Vicis Defendants learned that medical receivables

owned by a California company, Deutsche Medical Services, Inc. ("DMS"), were available for

sale.  AC ¶ 37.  The DMS receivables had a face value of $12 million and were offered for sale

at $8 million.  AC ¶ 39.  These medical receivables (the "DMS Receivables") concerned billings

for medication purportedly administered to worker's compensation patients in California.  AC

¶ 38.

Stastney and the Vicis Defendants provided MSMI with $8 million to purchase the DMS

Receivables through MSMI's wholly-owned subsidiary, OrthoSupply.  AC ¶¶ 43-4.  Hallal

alleges that Stastney and the Vicis Defendants directed MSMI to purchase the DMS Receivables

despite the fact that MSMI's business was unrelated to any type of collection activity and

without conducting due diligence to determine the collectability or legitimacy of the DMS

Receivables.  AC ¶¶ 41-2.

Initially, Stastney and the Vicis Defendants instructed MSMI to directly collect the DMS

Receivables, and Stastney directed MSMI's officers in Massachusetts to expand its offices and

hire staff in order to do so.  AC ¶ 47.  MSMI added significant staff and overhead expenses and

hired Global Healthcare Recovery, Inc. ("Global") to assist in the collection process.  AC ¶ 47.

      E.     The MDwerk's Contract

In October of 2007, the Vicis Defendants installed Stastney as a MSMI director.

AC ¶ 33.  In late 2007, the drain on MSMI overhead prompted Stastney to hire Phillips and

Midtown Partners to conduct a review of MSMI operations in Massachusetts.  AC ¶ 48.  After

this review, Stastney told MSMI to transfer the collections operations to MDwerks, another

company that had recently come under the control of the Vicis Defendants through a series of

transactions brokered by Midtown Partners.  AC ¶ 48.  Under the collection agreement imposed

by the Vicis Defendants, MDwerks was to receive 5% of the funds collected plus expenses,

Global was to receive 15%, and MSMI was to receive 80%.  AC ¶ 50.

MDwerks provided medical claims processing and management services for health care

providers but had no prior business activity related to medical receivables collection services.

AC ¶ 49.  MDwerks' move into the medical receivable collection business was accomplished by

hiring Global, at the direction of Stastney and Phillips, away from MSMI.  AC ¶ 49.

MSMI staff and minority shareholders perceived the MDwerks takeover of the DMS

Receivables business as a diversion of MSMI assets to MDwerks that yielded no benefit to

MSMI.  AC ¶ 49.  In 2007, MSMI President Brian Lesperance resisted the newly imposed

relationship with MDwerks and was fired.  AC ¶ 50.  In January of 2008, Stastney and the Vicis

Defendants installed Fisher as MSMI President.  AC ¶ 45.  In February of 2008, Phillips became

a managing director of Vicis Capital and exercised day to day control over MSMI business

operations.  AC ¶ 46.  Stastney and the Vicis Defendants made Phillips responsible for

overseeing the collection of the DMS Receivables.  AC ¶ 53.

      Hallal alleges that MDwerks and Katz converted approximately $2 million of the

amounts collected on the DMS Receivables to their own use, and that Phillips, Stastney and the

Vicis Defendants sanctioned MDwerks' conversion of these funds.  AC ¶¶ 53, 98-99, 101.

      F.     Fraudulent Receivables And FBI Investigation

      In the summer of 2008, Global had difficulty processing the DMS Receivables.  AC ¶ 55.

In July 2008, Global's president, Janine Boudreau, learned that the low collection rate was

because approximately 20 percent of the DMS Receivables were fraudulent claims in that the

underlying medication had never been dispensed.  AC ¶¶ 56-57.

      Boudreau promptly informed Katz, chief executive officer of MDwerks, of the

substantial number of fraudulent receivables.  AC ¶ 58.  Katz then consulted with Phillips

concerning the fraudulent receivables.  AC ¶ 59.  In August 2008, Katz met with Phillips in

person and informed him that a substantial percentage of the DMS Receivables were fraudulent.

AC ¶ 60.

      Hallal alleges that despite their awareness of the fraudulent receivables, the Vicis

Defendants made no attempt to cease the collection efforts.  AC ¶ 61.  In September 2008, the

Vicis Defendants consulted with Global regarding the possibility of collecting on fraudulent

insurance receivables.  AC ¶ 62.  Global then contacted the Federal Bureau of Investigation

("FBI").  AC ¶ 62.  Thereafter, the FBI began investigating the Vicis Defendants' management

of the DMS Receivables through MSMI and MDwerks.  AC ¶ 63.

In October 2008, Global suggested to Katz at the FBI's direction that Global implement a billing method by which the collection rate of the DMS Receivables could be increased.  AC ¶ 65.  This billing method involved adding fraudulent dates of service for services that never occurred (the "Illegal Scheme").  AC ¶ 66.  Boudreau informed Katz that Global would require an additional $250,000 payment to carry out the Illegal Scheme.  AC ¶ 67.

Katz met with Phillips at the Vicis Defendants' offices in New York City and: (1) set out in detail the proposed Illegal Scheme and informed the Vicis Defendants that the collection rate on the DMS Receivables could be substantially increased through its implementation; and (2) advised the Vicis Defendants that an additional payment to Global was necessary in order to do this.  AC ¶¶ 68, 71.  At the conclusion of the meeting, Phillips contacted Global and directed it to proceed with the Illegal Scheme.  AC ¶ 72.

Hallal alleges that in November 2008, Phillips, Stastney and the Vicis Defendants, through their control over MSMI, secretly involved MSMI in the Illegal Scheme and directed Fisher, MSMI's CEO, to involve MSMI offices in Massachusetts.  AC ¶ 73.  Specifically, Phillips instructed Fisher to act as an intermediary between the Vicis Defendants and Global concerning the execution of the Illegal Scheme.  AC ¶ 74.  Fisher thereafter relayed communications between the Vicis Defendants and Global.  AC ¶ 75.  On or about December 2008, Stastney, Phillips and the Vicis Defendants forwarded $250,000 to MSMI's account in Massachusetts and instructed Fisher to pay over that amount to Global as a bribe for implementing plan.  AC ¶ 76.  On or about December 31, 2008, Fisher confirmed to the Vicis Defendants that MSMI had paid the bribe to Boudreau as instructed.  AC ¶ 77.

G.      Disclosure Of FBI Investigation

On or about January 1, 2009, Fisher informed the Vicis Defendants via e-mail that

Global had completed adding the fraudulent dates of service to the fraudulent claims and that the

claims had been transferred to an out-of-state clearing house which would then forward them to

insurance companies for payment.  AC ¶ 78.  Despite their knowledge that the Vicis Defendants

had involved MSMI in criminal activity, Fisher and Stastney failed to notify other MSMI

officers, directors, shareholders, and the general public.  AC ¶ 79.

On or about January 15, 2009, Phillips sent a letter to Fisher at MSMI with the subject

line "FBI Investigation."  AC ¶ 81.  In the letter, Phillips encouraged MSMI to conduct an

internal investigation and to seek the advice of counsel.  AC ¶ 81.  On January 27, 2009, Fisher

resigned from MSMI, and, on January 28, 2009, Stastney resigned from MSMI's board of

directors.  AC ¶ 82.

On February 2, 2009, MSMI disclosed the FBI investigation in its SEC Form 8-K.  AC ¶

83.  Prior to that disclosure, Hallal alleges that MSMI stock consistently traded at or around

twenty cents ($.20) per share.  AC ¶ 87.  Within days of the disclosure, MSMI stock plunged

ultimately to one cent ($.01) per share on the public markets and never recovered.  AC ¶ 88.  In

addition, third party customers and vendors avoided doing business with MSMI due to the

criminal allegations and MSMI's income plummeted.  AC ¶ 89.

H.      Katz And Phillips Plead Guilty To Federal Charges

On January 12, 2010, the United States filed a one-count Information in the United States

District Court for the District of New Hampshire against Phillips charging him with conspiracy

to commit wire fraud in violation of 18 U.S.C. §§ 371, 1343 as a result of his involvement in the

Illegal Scheme.  AC ¶ 90; Exhibit A (Docket No. 29-1).  On January 19, 2010, Phillips pleaded

guilty.  AC ¶ 91.

On December 10, 2008, the United States filed a one-count Information in the United

States District Court for the District of New Hampshire against Katz charging him with health

care fraud in violation of 18 U.S.C. § 1347.  AC ¶ 92, Exhibit E (Docket No. 29-5).  On or about

April 4, 2010, Katz pleaded guilty.  AC ¶ 93.

I.        The Vicis Action And Roberts' Appointment As Director Of MSMI

In the fall of 2011, Marshall Sterman, who at that time was the sole officer and director

of MSMI, authorized MSMI to file a lawsuit in this District against the Defendants in this action

("the Vicis Action").  AC ¶ 105(b).  The complaint was filed on November 3, 2011.  AC ¶

105(c); see Medical Solutions Management, Inc. v. Vicis Capital, LLC, et al, No. 11-11949-

DPW.  MSMI and its subsidiary, Orthosupply Management, Inc., also filed a lawsuit in this

District against DMS ("the Deutsche Medical Action").  AC ¶ 105(i) n. 1.  The complaint was

filed on November 4, 2011.  Id.; see Medical Solutions Management, Inc. v. Sorat, et al., No. 11-

11963- DPW.

On November 16, 2011, the Vicis Defendants removed Sterman from office and

appointed Greg Roberts, a Vicis employee, as sole officer and director of MSMI.  AC ¶ 105(d),

(e).  On November 21, 2011, Roberts sent a letter to MSMI's counsel of record[7] directing them

to dismiss the Vicis Action and the Deutsche Medical Action.  AC ¶ 105(i).  When they

informed Roberts that they could not dismiss the matters as instructed, Roberts terminated them

---

[7] Counsel of record for MSMI at that time was Messrs. Brown and Schlichtmann, who
are currently Hallal's counsel.

as counsel.  AC ¶ 105(j), (k).  Roberts hired new counsel, and, on November 29, 2011, the new

counsel filed a notice of voluntary dismissal of the Vicis Action.  AC ¶ 105(l)-(n).

     J.     The Current Action

Hallal filed this action on January 27, 2012.  Docket No. 1.  On April 10, 2012, the Vicis

Defendants, Stastney, and Roberts filed motions to dismiss.  Docket Nos. 17, 22.  Phillips filed a

motion to dismiss on May 8, 2012.  Docket No. 25.  On May 18, 2012, Hallal filed the amended

complaint.  Docket No. 29.  In July 2012, the Vicis Defendants, Stastney, Phillips, and Roberts

filed motions to dismiss.  Docket Nos. 43, 45, 47.  The Court held a hearing on the motions on

October 24, 2012.

At oral argument, the Court raised two issues that had not been addressed by the parties:

(1) whether Hallal's current counsel has a conflict of interest because they previously

represented MSMI; and (2) whether MSMI's presence as a nominal defendant destroyed

diversity jurisdiction.[8]  Finding that the issues were important to its determination of the

motions, the Court ordered supplemental briefing on these matters, which the parties filed in

---

[8] The Court raised the issue of diversity jurisdiction because at the time of the events
alleged in the Amended Complaint, MSMI, a Nevada corporation, had a principal place of
business in Massachusetts and Hallal is a resident of Massachusetts.  In considering diversity
jurisdiction, a corporation is a citizen of the state in which it is incorporated and of the state in
which it has its principal place of business.  28 U.S.C. § 1332(c)(1).  A corporation's "principal
place of business" refers "to the place where a corporation's officers direct, control, and
coordinate the corporation's activities."  Hertz Corp. v. Friend, 130 S. Ct. 1181, 1192 (2010).
"[I]n practice it should normally be the place where the corporation maintains its headquarters –
provided that the headquarters is the actual center of direction, control, and coordination, i.e.,
the 'nerve center.'"  Id.  In addition, the citizenship of a party is determined at the time of the filing
of the complaint.  See Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 570-1 (2004).
Hallal argues that MSMI's principal place of business at the time of the filing of the amended
complaint was New York, and Defendants have not disputed this.  AC ¶ 13; Docket No. 62, p. 5-
6.  Accordingly, this Court finds that there is diversity jurisdiction.

November and December 2012.  Docket Nos. 61-62, 65-67, 70.

## II.    MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

The Vicis Defendants, Stastney, and Phillips have moved to dismiss Hallal's claims

against them pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal

jurisdiction.  Both they and Roberts have also filed motions to dismiss pursuant to Rule 12(b)(6)

for failure to state a claim.  "[A] federal court generally may not rule on the merits of a case

without first determining that it has jurisdiction over the category of claim in suit (subject-matter

jurisdiction) and the parties (personal jurisdiction)."  Sinochem Int'l Co., Ltd. v. Malaysia Int'l

Shipping Corp., 549 U.S. 422, 430-31 (2007).  Therefore, the Court first addresses the

jurisdictional issue.

A.    Standard Of Review

Although several defendants filed motions to dismiss, Hallal ultimately bears the burden

of persuading the Court that it has personal jurisdiction over them.  Hannon v. Beard, 524 F.3d

275, 279 (1st Cir. 2008).  In considering a motion to dismiss for lack of personal jurisdiction, a

court may choose from three methods for determining whether the plaintiff has met his burden of

establishing personal jurisdiction.  Adelson v. Hananel, 510 F.3d 43, 48 (1st Cir. 2007).  These

methods include the prima facie method, the "preponderance of the evidence" method, and the

"likelihood" method.  Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145-47 (1st

Cir. 1995).  When, as here, a court rules on a motion to dismiss for lack of personal jurisdiction

without holding an evidentiary hearing, the "prima facie" standard governs its determination.

United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001).  Under the prima facie

standard, Hallal must "go beyond the pleadings and make affirmative proof" to demonstrate the

existence of personal jurisdiction.  Id. at 619.  However, the Court "accept[s] the plaintiff's

(properly documented) evidentiary proffers as true" and construes those facts "in the light most

congenial to the plaintiff's jurisdictional claim."  Hannon, 524 F.3d at 279 (internal quotation

marks and citations omitted).

      B.     Jurisdictional Facts[9]

The parties have submitted the following facts in support of their arguments regarding

personal jurisdiction.

      1.     MSMI

Sterman reports that at all times relevant to the Amended Complaint, MSMI maintained a

principal office in Marlboro, Massachusetts, and that MSMI had no other offices or operations

aside from a mailing address in Nevada.  Sterman Affidavit, ¶ 4.

      2.     The Vicis Defendants

Vicis Capital is incorporated under Delaware law and has a principal place of business in

New York.  Stastney Affidavit ¶2.  Vicis Capital has no direct ownership interest in the Vicis

Fund.  Id. at ¶ 2.  The Vicis Fund is organized under the laws of the Cayman Islands.  Id. at ¶ 3.

Neither Vicis Capital nor the Vicis Fund maintains any offices in Massachusetts, owns or leases

any property in Massachusetts, has any bank accounts in Massachusetts, pays Massachusetts

taxes, or has a registered agent in Massachusetts.  Id. at ¶ 4.

      3.     Stastney

Stastney has been the chief operating officer of Vicis Captial since its founding in 2004.

---

     [9]  These facts are based on the affidavits of Stastney ("Stastney Affidavit"), Phillips
("Phillips Affidavit"), and MSMI's former chairman, Marshall Sterman ("Sterman Affidavit").
Docket Nos. 46-1, 48-1, and 52, respectively.

Stastney Aff. ¶ 1.  Stastney currently resides in New Jersey and has lived there since 2004.  Id. at

¶ 5.  He works in New York City and has done so since 1994.  Id. at ¶ 6.  He does not own

property in Massachusetts, have any bank accounts in Massachusetts, or pay any Massachusetts

taxes.  Id. at ¶ 7.  Over the six years that the Vicis Defendants held MSMI securities, Stastney

traveled to Massachusetts to meet MSMI personnel on four occasions.  Id. at ¶ 11.  He asserts

that he has never entered into any transactions, signed any documents, made calls, or sent letters,

facsimiles, or emails on MSMI's behalf.  Id. at ¶ 12.

On the contrary, Sterman asserts that there are numerous emails between Stastney and

MSMI officers and shareholders, and that since 2006 no major MSMI business decisions were

made without express input from Stastney and/or Phillips.  Sterman Affidavit, ¶¶ 8, 11, 22.

Sterman states that MSMI President Brian Lesperance was in constant contact with Stastney by

email or telephone regarding business operations and that Stastney was the ultimate decision

maker regarding MSMI corporate actions.  Id. at ¶¶ 12, 16.  Sterman also asserts that Stastney

was personally present at MSMI offices in Marlboro, Massachusetts in late 2006 or early 2007 to

mandate a new financial plan for MSMI that included the purchase of the DMS Recievables.  Id.

at ¶ 13.  Sterman states that Stastney was in email and telephone contact with MSMI officers

regarding the financing and conduct of the collections operations.  Id. at ¶ 14.  Sterman also

reports that Stastney joined MSMI's board of directors in October 2007, and in the fall of 2007

hired Phillips and Midtown Partners to review MSMI operations.  Id. at ¶¶ 15, 17.  Sterman

reports that as a result of this review, Stastney directed MSMI to turn over the collection of the

DMS claims to MDwerks.  Id. at ¶¶ 18, 19.

4.     <u>Phillips</u>

Phillips became a Vicis Capital employee on February 15, 2008.  Phillips Affidavit, ¶ 13. He resides in Florida, where he has lived since 1984 and worked since 1995.  <u>Id.</u> at ¶¶ 1-2.  He has never lived or been employed in Massachusetts, and he does not own or rent property, have bank accounts, or pay any taxes in Massachusetts.  <u>Id.</u> at ¶¶ 3-4.  Phillips reports that he has traveled to Massachusetts "on only a few occasions" and that none of these trips "involved facts or circumstances directly related to this case or Plaintiff's allegations regarding the DMS receivables."  <u>Id.</u> at ¶ 6.  Phillips states that he has never been to MSMI headquarters in Marlboro, Massachusetts, although he did attend an investment meeting in June 2005 at MSMI's offices in Andover, Massachusetts when he was President and Chief Executive Officer of Apogee Investments.  <u>Id.</u> at ¶¶ 5, 7.  He also states that he flew into Boston's Logan airport in 2006 and had breakfast with Sterman, although he maintains it did not relate to the DMS receivables.  <u>Id.</u> at ¶¶ 10-12.

Sterman asserts that Phillips spent a substantial amount of time in Massachusetts investigating MSMI on behalf of the Vicis Defendants and negotiating an investment deal with MSMI shareholders.  Sterman Affidavit, ¶ 7.  Sterman states that in the fall of 2007, Phillips visited MSMI offices in Massachusetts, interviewed MSMI officers and employees and reviewed MSMI business records.  <u>Id.</u> at ¶ 17.  Sterman also reports that since 2006, no major MSMI business decisions were made without express input from Stastney and/or Phillips.  <u>Id.</u> at ¶¶ 11, 22.

Sterman asserts that Phillips enlisted MSMI's President, Lowell Fisher, for the insurance fraud scheme and directed Fisher to bribe the collection agent with $250,000.  <u>Id.</u> at ¶ 23.

15

Sterman alleges that the $250,000 was approved and furnished by the Vicis Defendants and sent

from the Vicis Defendant's account to MSMI in Massachusetts.  Id.  Fisher then transferred this

money from MSMI's Massachusetts bank account to the collection agent.  Id.

     C.     <u>Analysis</u>

In determining whether a non-resident defendant is subject to its jurisdiction, a federal

court exercising diversity jurisdiction "is the functional equivalent of a state court sitting in the

forum state."  <u>Sawtelle v. Farrell</u>, 70 F.3d 1381, 1387 (1st Cir. 1995).  A court may exercise

authority over a defendant by virtue of either general or specific jurisdiction.  <u>Mass. Sch. of Law</u>

<u>at Andover, Inc. v. Am. Bar Ass'n</u>, 142 F.3d 26, 34 (1st Cir. 1998).  General jurisdiction exists

when the defendant has engaged in "continuous and systematic activity" in the forum, even if the

activity is unrelated to the suit.  <u>United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.</u>,

960 F.2d 1080, 1088 (1st Cir. 1992).  "In the absence of general jurisdiction, a court's power

depends upon the existence of specific jurisdiction."  <u>Mass. Sch. of Law</u>, 142 F.3d at 34.  To

establish specific, or personal, jurisdiction, Hallal must demonstrate that the Massachusetts long-

arm statute grants jurisdiction over each Defendant and that the exercise of that jurisdiction

comports with the Due Process Clause of the Fifth Amendment.  <u>Adelson v. Hananel</u>, 652 F.3d

75, 80 (1st Cir. 2011).  The facts may be derived from the pleadings, and the parties'

supplementary filings, including affidavits, taking the facts affirmatively alleged by the plaintiff

as true and viewing disputed facts in the light most favorable to the plaintiff.  <u>Sawtelle</u>, 70 F.3d

at 1385.

     1.     <u>General Jurisdiction</u>

General jurisdiction exists when a defendant has engaged in "continuous and systematic

activity" in the forum, even if the activity is unrelated to the suit.  United Elec., Radio & Mach. Workers of Am., 960 F.2d at 1088.  "In evaluating whether the exercise of personal jurisdiction is warranted, courts concentrate on the 'quality and quantity of contacts between the potential defendant and the forum.'"  Swiss Am. Bank, 274 F.3d at 619 (quoting Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999)).  In addition to showing that the defendant has "continuous and systematic" contacts with the forum, the plaintiff must also show that the exercise of jurisdiction would be reasonable.  Id.  "As a threshold matter, 'the standard for evaluating whether these contacts satisfy the constitutional general jurisdiction test is considerably more stringent than that applied to specific jurisdiction questions.'"  Id. (quotation omitted).

"For an individual, the paradigm focus for the exercise of general jurisdiction is the individual's domicile; for a corporation it is an equivalent place, one in which the corporation is fairly regarded as at home."  Goodyear Dunlop Tires Ops. v. Brown, 131 S.Ct. 2846, 2853-54 (2011) (citation omitted).  Hallal has presented no evidence (or even unsupported allegations) that the Vicis Defendants are residents of Massachusetts, own property or have offices in Massachusetts, regularly transact business in Massachusetts, or have otherwise engaged in continuous and systematic activity in Massachusetts.  None of the evidence presented suggests that the Vicis Defendants, Stastney, or Phillips are "at home" in Massachusetts.  The presented contacts with Massachusetts fall short of the "continuous and systematic general business contacts" necessary to empower a federal court in Massachusetts to entertain a suit against it

there.[10]  Accordingly, this Court finds that it does not have general jurisdiction over these defendants.

## 2.  Specific Jurisdiction

"In the absence of general jurisdiction, a court's power depends upon the existence of specific jurisdiction." Mass. Sch. of Law, 142 F.3d at 34.  To establish specific jurisdiction, Hallal must demonstrate that the Massachusetts long-arm statute grants jurisdiction over the Vicis Defendants, Phillips, and Stastney, and that the exercise of that jurisdiction comports with the Due Process Clause of the Fifth Amendment.  Adelson, 652 F.3d at 80.

The Court need not pause to consider the particulars of the Massachusetts long-arm statute because even if that statute, correctly applied, would purport to grant jurisdiction over these defendants, Hallal must still demonstrate that "the exercise of jurisdiction pursuant to that statute comports with the strictures of the Constitution." Mass. Sch. of Law, 142 F.3d at 35; see also Hannon, 524 F.3d at 280 ("Because we have construed the Massachusetts long-arm statute to be coextensive with the limits allowed by the United States Constitution, we often 'sidestep the statutory inquiry and proceed directly to the constitutional analysis.'").  The constitutional analysis has three distinct components: "relatedness, purposeful availment (sometimes called 'minimum contacts'), and reasonableness." Hannon, 524 F.3d at 282 (internal quotations and

---

[10]  Hallal does not address defendants' arguments regarding general jurisdiction, instead stating that there is a "discoverable question" as to whether the Court has general jurisdiction over them.  Docket No. 51, p. 17.  A "diligent" plaintiff may be entitled to a small amount of jurisdictional discovery if it presents "a colorable case" for the existence of personal jurisdiction. Swiss Bank, 274 F.3d at 625-6.  However, a plaintiff must provide facts to the court that show that jurisdiction would be found if it conducts the permitted discovery. Id. at 626.  Here Hallal argues that because, in his opinion, defendants have a "disregard for the truth," he may uncover other facts supporting general jurisdiction through discovery.  Docket No. 51, p. 17.  Without more, this argument is an insufficient basis for jurisdictional discovery.

citations omitted).

      a.    <u>Relatedness</u>

To satisfy the relatedness component, Hallal's claims must "arise out of, or be related to, the defendant's in-forum activities." <u>Id.</u>  This standard is flexible and focuses on the nexus between the defendant's contacts with the forum and the plaintiff's cause of action.  <u>Id.</u> However, there are some constraints on its application.  The First Circuit has described the relatedness standard as follows:

> The relatedness requirement is not an open door; it is closely read, and it requires a showing of a material connection.  This court steadfastly rejects the exercise of personal jurisdiction whenever the connection between the cause of action and the defendant's forum-state contacts seems attenuated and indirect.  Instead, the defendant's in-state conduct must form an important, or at least material, element of proof in the plaintiff's case.  A broad but-for argument is generally insufficient.  Because "but for" events can be very remote, due process demands something like a "proximate cause" nexus.

<u>Harlow v. Children's Hosp.</u>, 432 F.3d 50, 61 (1st Cir. 2005) (internal citations, quotations and modifications omitted).  In other words, to demonstrate relatedness, Hallal must show a demonstrable nexus between his claims and each defendant's forum based activities, such that the litigation itself is founded directly on those activities.  <u>Adelson</u>, 652 F.3d at 81.

Hallal asserts that this Court has personal jurisdiction over the Vicis Defendants as well as Phillips and Stastney as individuals.  The Court will address the relatedness argument for each defendant in turn.

      i.    <u>The Vicis Defendants</u>

The crux of Hallal's claims is that in December 2008, the Vicis Defendants, through Phillips and Stastney, involved MSMI in the collection of fraudulent receivables by using MSMI, then located in Massachusetts, to purchase the receivables, to collect the receivables, and

to use its Massachusetts bank account to pay a $250,000 bribe to Global to further collect on the receivables. AC ¶ 76. Hallal alleges that because of this wrongful conduct, the Vicis Defendants, Phillips, and Stastney did not properly manage MSMI and directed Roberts to dismiss the Vicis and Deutsche Medical Actions. AC ¶¶ 121-140, 162-171. Hallal also alleges that these defendants sanctioned Katz and MDwerk's conversion of the funds it collected on legitimate receivables. AC ¶¶ 53, 100. Hallal brings several tort[11] claims against the Vicis Defendants based on these allegations, specifically: breach of fiduciary duty (Counts I, III, VIII), aiding & abetting/civil conspiracy (Count II), interference with contractual relations (Count VI), interference with advantageous business relations (Count VII), and violation of Chapter 93A (Counts III, X).[12] Because "[q]uestions of specific jurisdiction are always tied to the particular claims asserted," this Court must analyze the issue of personal jurisdiction with respect to each claim separately. MHA Financial Corp. v. Varenko Investments Ltd., 583 F. Supp. 2d 173, 178 (D. Mass. 2008) (quoting Phillips Exeter Academy, 196 F.3d at 289).

"Because the elements differ in a tort case, a court charged with determining the

---

[11] Claims for conversion, aiding and abetting, interference with contractual relations, breach of fiduciary duty, civil conspiracy, interference with advantageous business relations, and Chapter 93A sound in tort. See, e.g., City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.), 656 F.3d 82, 88 (1st Cir. 2011) (conversion, interference with contractual relations, breach of fiduciary duty, and civil conspiracy); Int'l Strategies Group, Ltd. v. Greenberg Traurig, LLP, 482 F.3d 1, 14 (1st Cir. 2007) (aiding and abetting); Comeau v. Town of Webster, No. 11-40208, 2012 U.S. Dist. LEXIS 102539, at *33 (D. Mass. July 24, 2012) (interference with advantageous business relations); Lyle Richards Int'l v. Ashworth, Inc., 132 F.3d 111, 114 (1st Cir. 1997) (assuming, without deciding, that Chapter 93A violation constitutes a tortious injury).

[12] At oral argument, Hallal stated that he did not oppose the dismissal of his breach of contract and breach of the covenant of good faith and fair dealing claims (Counts IV and V) against Phillips and the Vicis Defendants. Docket No. 63, p. 63-64. Accordingly, the Court recommends dismissal of these claims against those defendants.

existence <u>vel</u> <u>non</u> of personal jurisdiction must probe the causal nexus between the defendant's contacts and the plaintiff's cause of action." <u>Phillips Exeter Academy</u>, 196 F.3d at 289.  A court's inquiry is "whether the plaintiff has established cause in fact (<u>i.e.</u>, the injury would not have occurred but for the defendant's forum-state activity) and legal cause (<u>i.e.</u>, the defendant's in-state conduct gave birth to the cause of action)." <u>Hannon</u>, 524 F.3d at 282 (quoting <u>Mass. Sch. of Law</u>, 142 F.3d at 35).

Hallal's claims are based on the allegation that in December 2008, the Vicis Defendants, Phillips, and Stastney involved MSMI in the collection of fraudulent receivables by using MSMI and its Massachusetts bank account to pay a $250,000 bribe to Global.  AC ¶ 76; Sterman Affidavit, ¶ 23.  Hallal has not alleged where the relevant individuals were located when these communications and the money transfer took place.  Even assuming, <u>arguendo</u>, that these defendants were outside of Massachusetts, a lack of physical presence is not fatal to personal jurisdiction.  <u>Swiss Am. Bank</u>, 274 F.3d at 622 (citing <u>Burger King</u>, 471 U.S. at 476).  "The transmission of facts or information into Massachusetts via telephone or mail would of course constitute evidence of a jurisdictional contact directed into the forum state." <u>Mass School of Law</u>, 142 F.3d at 36.[13]  Hallal has alleged that these defendants both directed MSMI to participate in the scheme as well as forwarded the bribe money to MSMI's Massachusetts bank

---

[13]  Although Hallal asserts that Stastney and Phillips were in constant contact with MSMI through email, he has not provided any details, short of a few isolated emails from 2006, of these contacts.  The relatedness requirement cannot be met "merely because Plaintiff's cause of action arose out of a general relationship between the parties." <u>Lockebridge, LLC v. RGMS Media, Inc.</u>, No. 11-12252, 2012 U.S. Dist. LEXIS 86504, at * 19-20 (D. Mass. June 22, 2012) (citing <u>Sawtelle</u>, 70 F.3d at 1389).  Furthermore, while emails and telephone calls may be "contacts," these contacts, taken together, must constitute the conduct that caused Hallal's injuries.  <u>Id.</u> Hallal has not provided a connection between these emails and his claims.

accounts for use in this scheme.  Accordingly, Hallal has alleged that the Vicis Defendants,

through Phillips and Stastney, had sufficient contacts with Massachusetts.

The First Circuit has rejected the notion that in-forum effects of extra-forum activities are

sufficient to constitute minimum contacts.  Mass School of Law, 142 F.3d at 36; Swiss Am.

Bank, 274 F.3d at 625; Sawtelle, 70 F.3d at 1390-1.  However, in this case, the communications,

the resulting actions by MSMI, and the forwarding of the funds through Massachusetts are a

material part of Hallal's claims.  See Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 10

(1st Cir. 2009) (relatedness inquiry satisfied when defendant's conduct in Florida and California

caused an injury in forum state); N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 25 (1st Cir.

2005) (relatedness inquiry satisfied when plaintiff's in forum injury occurred as a result of

tortious activity in another state).  In arguing a lack of personal jurisdiction, the Vicis Defendants

in their recitation of the facts omit any reference to involvement with MSMI.  See Docket No.

46, p. 8-9.  This omission is significant.  As alleged, the Vicis Defendants caused MSMI, at the

time a Massachusetts corporation, to purchase receivables that are the subject of this action, to

collect them, and to file a lawsuit about them in Massachusetts.  AC, p. 2-3, 5.  Thus, at this

stage in the case, Hallal has established cause in fact (i.e., the injury would not have occurred but

for the defendant's communications and forwarding the funds to Massachusetts) and legal cause

(i.e., the defendant's communications and forwarding the funds to Massachusetts gave birth to

the cause of action).  Accordingly, this Court finds that the Vicis Defendants' contacts with

Massachusetts are related to Hallal's claims.

      ii.    Phillips And Stastney

Hallal seeks to hold Phillips and Stastney liable on the following claims: breach of

fiduciary duty (Counts I, III, VIII), aiding and abetting/civil conspiracy to commit a breach of

fiduciary duty and convert (Count II), interference with contractual relations (Count VI),

interference with advantageous business relations (Count VII), and violations of Chapter 93A

(Counts III, X).

"The general rule is that jurisdiction over the individual officers of a corporation may not

be based merely on jurisdiction over the corporation."  Escude Cruz v. Ortho Pharmaceutical

Corp., et al., 619 F.2d 902, 906 (1st Cir. 1980).  "What is required is some showing of direct

personal involvement by the corporate officer in some decision or action which is causally

related to the plaintiff's injury."  Id. at 907.  "The question, therefore, is whether the complaint,

together with the affidavits of the individual defendants, allege sufficient facts to establish that

any of them personally participated in causing plaintiff's injury."  Id.   Accordingly, the Court

will analyze whether there is a causal nexus between Phillips and Stastney's contact with the

forum and Hallal's claims.

At this stage in the proceedings, and construing the facts in favor of Hallal, the Court

finds that it has personal jurisdiction over these defendants.  As stated supra, Hallal has alleged

that Phillips and Stastney directed MSMI to participate in the Illegal Scheme as well as

forwarded the bribe money to MSMI's Massachusetts bank accounts for use in this scheme.  AC

¶ 73; Sterman Affidavit, ¶ 23.  Hallal alleges that because of this wrongful conduct, Phillips and

Stastney did not properly manage MSMI and Stastney directed Roberts to dismiss the Vicis and

Deutsche Medical Actions.  AC ¶¶ 121-140, 162-171.  Hallal has also alleged that Stastney and

Phillips interfered with MSMI's business relationships with third parties and caused Katz and

MDwerks to breach their contracts with MSMI, thereby injuring MSMI in Massachusetts.  AC ¶

158; AC ¶ 154.  Accordingly, at this stage in the litigation, this Court finds that Hallal has

sufficiently alleged that his claims are related to these defendants' contacts with Massachusetts.

        b.     <u>Purposeful Availment</u>

Even if Hallal could demonstrate that the Vicis Defendants, Phillips, and Stastney's

contacts with Massachusetts were related to his causes of action, he must also show that their

contacts "represent a purposeful availment of the privilege of conducting activities in the forum

state, thereby invoking the benefits and protections of that state's laws and making the

defendant's presence before the state's courts foreseeable."  <u>Hannon</u>, 524 F.3d at 284.  This

requirement "ensures that jurisdiction is not based on merely random, isolated or fortuitous

contacts with the forum state, and is based upon the 'cornerstones of voluntariness and

foreseeability."  <u>Id.</u> (internal modifications and citations omitted).  The defendant's contacts

"must be voluntary and not based on the unilateral actions of another party" and "must be such

that [the] defendant could reasonably anticipate being haled into court there."  <u>Id.</u> (internal

modifications omitted).  "Even if a defendant's contacts with the forum are deemed voluntary,

the purposeful availment prong of the jurisdictional test investigates whether the defendant

benefitted from those contacts in a way that made jurisdiction foreseeable."  <u>Id.</u> (citing <u>Phillips

Exeter Acad.</u>, 196 F.3d at 292).   "So long as it creates a 'substantial connection' with the forum,

even a single act can support jurisdiction." <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 476

n. 18 (1985) (citing <u>McGee v. International Life Ins. Co.</u>, 355 U.S. 220, 223 (1957)).

        According to the facts alleged by Hallal, which this Court must construe in the light most

favorable to him, the Vicis Defendants, Phillips, and Stastney forwarded $250,000 to MSMI's

account in Massachusetts and told Fisher, MSMI's president, to pay the bribe to Global.  As

alleged, this action was voluntary and was not random or fortuitous.  Accordingly, the Vicis

Defendants, Phillips, and Stastney could have foreseen the possibility of being haled into court in

Massachusetts as a result of this contact, and this Court finds that Hallal has satisfied the

purposeful availment component of the inquiry.

        c.    <u>The Gestalt Factors</u>

As a final consideration in the due process inquiry, this Court must weigh the

reasonableness of exercising jurisdiction over the defendants, taking into account a number of

so-called "Gestalt" factors.  <u>Foster-Miller, Inc.</u>, 46 F.3d at 150.  The Gestalt factors include:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

<u>United Elec., Radio & Mach. Workers</u>, 960 F.2d at 1088 (citing <u>Burger King</u>, 471 U.S. at 477).

"The factors, intended to aid the court in achieving substantial justice, play a larger role in cases

where the minimum contacts question is very close."  <u>Adelson</u>, 510 F.3d at 51.

Defendants have not argued that any "special or unusual burden" exists in this case that

would prevent them for appearing here.  <u>Id.</u>  Furthermore, Hallal, "a resident of the state, has an

interest in bringing this action in Massachusetts, which weighs in favor of a finding of personal

jurisdiction," and the Court may award a degree of deference to a plaintiff's choice of forum.  <u>Id.</u>

at 51-52.  Also, Massachusetts has a "stake in being able to provide a convenient forum for its

residents to redress injuries inflicted by out-of-forum actors."  <u>Id.</u> at 51 (quoting <u>Daynard v.</u>

<u>Ness, Motley, Loadholt, Richardson & Poole, P.A.</u>, 290 F.3d 42, 62 (2002)).  The Gestalt factors

weigh in Hallal's favor.

In summary, this Court finds that it has personal jurisdiction over the Vicis Defendants,

Phillips, and Stastney because their contacts with Massachusetts constitute "minimum contacts" in such a manner that it does not "offend traditional notions of fair play and substantial justice" for Hallal to bring this case in Massachusetts.  Accordingly, this Court recommends that the District Court deny the pertinent motions to dismiss on the basis of lack of personal jurisdiction.

## III.    MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

The Vicis Defendants, Stastney, Phillips and Roberts (collectively as "the Moving Defendants") have moved to dismiss the claims against them for failure to state a claim.

### A.    Scope Of The Record

The parties have attached documents to the pleadings and briefs.  In considering the merits of a motion to dismiss, the Court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken.  Nollet v. Justices of the Trial Court of Mass., 83 F.Supp.2d 204, 208 (D. Mass. 2000), aff'd, 248 F.3d 1127 (1st Cir. 2000).  Courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties, for official public records, for documents central to plaintiff's claim or for documents sufficiently referred to in the complaint.  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).  Consideration of other materials is generally forbidden unless the motion is properly converted into one for summary judgment.  Id.

Hallal has attached the following documents to his complaint: (1) Phillips' Plea Agreement and Information (Exhibit A); (2) a November 21, 2011 letter from Roberts to Orestes Brown (Exhibit B); (3) a November 16, 2011 resolution appointing Roberts as President, Secretary, and Treasurer of MSMI (Exhibit C); (4) Sorat's Plea Agreement and Information

(Exhibit D); (5) Katz's Plea Agreement and Information (Exhibit E); (6) the docket for the Vicis

Action (Exhibit F); (7) a November 21, 2011 letter from Roberts to Jan Schlichtmann (Exhibit

G); and (8) the docket for the Deutsche Medical Action (Exhibit H).  This Court finds that it may

consider all of the attached documents because they are attached to the Amended Complaint.  In

any event, the documents are either public records (Exhibits A, D-F, H) or are sufficiently

referred to in the complaint (Exhibits B, C, and G).

Roberts has attached the following documents to his brief: (1) MSMI's Articles of

Incorporation (Exhibit B); and (2) an SEC Form 4, Statement of Changes in Beneficial

Ownership of Securities (Exhibit C).  Docket No. 44.  The Vicis Defendants and Stastney have

attached the following documents to their brief: (1) MSMI's November 18, 2008 Form 10-Q

(Exhibit A); and (2) MSMI's Articles of Incorporation (Exhibit B).[14]  Although ultimately not

relevant to its determination of the current motions, the Court may consider these documents

because they are matters of public record.

B.      Standard Of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  "The

---

[14]   These defendants also attached legal authority to their briefs.  See Docket No. 44,
Exhibit A (portion of an Massachusetts Continuing Legal Education volume regarding Chapter
93A) and Docket No. 46, Exhibit C (slip opinion in Sisson v. Bank of America, 10-01464 (D.
Nev. 2010)).

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Langadinos v. American Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000). While the court must accept as true all of the factual allegations contained in the complaint, that doctrine is not applicable to legal conclusions. Iqbal, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.; see also Sanchez v. Pereira-Castillo, 590 F.3d 31, 48 (1st Cir. 2009) ("In other words, a plaintiff must offer 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation,' in order to claim a 'plausible entitlement to relief.'") (citations omitted). Accordingly, a complaint does not state a claim for relief where the well-pleaded facts fail to warrant an inference of any more than the mere possibility of liability. Iqbal, 556 U.S. at 679.

 C. Fed. R. Civ. P. 9(b)

The Vicis Defendants, Stastney, and Phillips argue that Hallal's claims must comply with Rule 9(b) of the Federal Rules of Civil Procedure. Docket No. 46, p. 9-10, 12, 24; Docket No. 48, p. 7, 13, 16-17. Pursuant to Rule 9(b), a party must state "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Rule 9(b) requires that a plaintiff's averments of fraud "specify the time, place, and content of the alleged false or fraudulent representations." United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 226 (1st Cir. 2004). The purpose of this requirement is to "give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to

discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information during discovery." Id. (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996)).

The First Circuit has interpreted Rule 9(b)'s particularity requirement to apply not only to actual fraud claims but also to "associated claims where the core allegations effectively charge fraud." N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 15 (1st Cir. 2009) (citing Hayduck v. Lanna, 775 F.3d 441, 443 (1st Cir. 1985) (applying Rule 9(b) to negligent misrepresentation and breach of fiduciary duty claims)).  One of Hallal's central allegations is that the Vicis Defendants, through Stastney and Phillips, involved MSMI in the insurance fraud scheme.  Those allegations form the basis for the breach of fiduciary duty (Counts I, III), aiding & abetting/civil conspiracy (Count II), and a portion of the Chapter 93A (Counts X) claims.  Accordingly, this Court will apply Rule 9(b) to these claims.  Because the remaining claims are not based on fraud, this Court will apply Rule 8's "plain statement" requirement to Hallal's claims alleging interference with contractual relations (Count VI), interference with advantageous business relations (Count VII), breach of fiduciary duty based on negligence (Count VIII), and Chapter 93A based on the dismissal of the Vicis Action (Count III).

   D.   Breach Of Fiduciary Duty (Counts I, III, VIII)

Hallal brings three different claims for breach of fiduciary duty against different permutations of defendants.  The breaches alleged are: (1) participation in the insurance fraud scheme (Count I); (2) dismissal of the Vicis and Deutsche Medical Actions (Count III); and (3) a negligent failure to adopt policies regarding the collection of receivables (Count VIII).  In order

to state a claim for a breach of fiduciary duty, Hallal must show: (1) the existence of a fiduciary

duty; (2) the breach of that duty; (3) and that the breach proximately caused the damages.

Brown v. Kinross Gold U.S.A., Inc., 531 F. Supp. 2d 1234, 1245 (D. Nev. 2008).[15]  This Court

will address the claims against each defendant in turn.

               1.      The Vicis Defendants

Hallal alleges that as controlling shareholder, the Vicis Defendants owed fiduciary duties

of loyalty, care and good faith and fair dealing to MSMI and its minority shareholders, and that

they violated these duties by participating in the insurance fraud scheme (Count I); (2)

dismissing the Vicis and Deutsche Medical Actions (Count III); and (3) negligently failing to

adopt policies regarding the collection of receivables (Count VIII).

A majority or controlling shareholder owes a fiduciary duty to minority shareholders.

See  Pepper v. Litton, 308 U.S. 295, 306 (1939); Kinross Gold U.S.A., Inc., 531 F. Supp. 2d at

1245.  This includes "a fiduciary duty not to misuse his power by promoting his personal

interests at the expense of corporate interests."  United States v. Byrum, 408 U.S. 125, 137

(1972).  This Court finds that Hallal has stated sufficiently a claim against the Vicis Defendants

for breach of fiduciary duty regarding their alleged participation in the insurance scheme and

their dismissal of the Vicis Action, but not regarding the negligent failure to adopt policies.

---

[15]    In diversity cases, a federal court must apply the conflict of law rules of the state in
which it sits.  Slattery v. Bower, 924 F.2d 6, 9 (1st Cir. 1991).  Under Massachusetts law, the
court must apply the laws of the state of incorporation to the internal affairs of the corporation.
Id. "[O]nly one State should have the authority to regulate a corporation's internal affairs –
matters peculiar to the relationships among or between the corporation and its current officers,
directors, and shareholders." Harrison v. NetCentric Corp., 433 Mass. 465, 470-2 (2001)
(citation omitted.).  Accordingly, this Court will apply the substantive law of Nevada, MSMI's
place of incorporation, to the breach of fiduciary duty claims, which focus on Stastney and
Roberts' actions as officers of MSMI as well as the Vicis Defendants' actions as a shareholder.

Hallal has alleged that: (1) in August 2008, Katz informed Phillips, a Vicis Capital managing director, that a percentage of the DMS Receivables were fraudulent; (2) in October 2008, the Vicis Defendants and Katz discussed adding fraudulent dates for services that never occurred and that a payment to Global to implement this plan was necessary; (3) in December 2008, the Vicis Defendants forwarded $250,000 to MSMI's accounts and instructed Fisher, MSMI's president, to pay that amount to Global to implement the scheme; and (4) in January 2009, Fisher emailed the Vicis Defendants that the scheme was underway. AC ¶¶ 60-79. Hallal alleges that MSMI was damaged when its stock price dropped approximately 70% from twenty cents to one cent after the FBI's investigation became public. AC ¶ 88. Hallal also alleges that the Vicis Defendants directed Roberts to dismiss MSMI's actions against them, which Hallal alleges were in the best interests of MSMI and an opportunity to recover damages for the injuries it had suffered as a result of the insurance scheme. AC ¶¶ 131, 136. Taken as true, these actions allege with sufficient particularity that the Vicis Defendants breached their duty to the minority shareholders by engaging in the allegedly Illegal Scheme and dismissing the actions. Accordingly, this Court recommends that the motion to dismiss Counts I and III be denied.

However, the Court finds that Hallal has not stated a claim regarding the Vicis Defendants' negligent failure to adopt policies. Hallal alleges that the Vicis Defendants breached their fiduciary duties by not: (1) adopting policies and procedures regarding the collection of receivables; (2) monitoring MSMI's officers, directors, and employees regarding collection policies; (3) reasonably investigating after notice of an unsafe or unsound practice; and (4) conducting MSMI's business in accordance with the law. AC ¶¶ 162-171. However, Hallal has not provided any legal basis for the proposition that the Vicis Defendants, as majority

shareholders, had a duty to adopt and/or monitor such policies.  See Docket No. 51, p. 22-23.

Accordingly, the Court recommends dismissal of Count VIII against the Vicis Defendants.

     2.   Roberts

Hallal alleges that Roberts, as sole officer and director of MSMI, breached his fiduciary

duty by dismissing the Vicis and Deutsche Medical Actions that were brought in the best interest

of MSMI.  AC ¶¶ 121-140.  Under Nevada law, directors have certain fiduciary obligations to

the corporation and to its shareholders, including a duty of care and loyalty.  Rapaport v. Soffer,

No. 10-935, 2012 U.S. Dist. LEXIS 90324, *14 (D. Nev. June 29, 2012) (citing Horwitz v.

Southwest Forest Industries, Inc., 604 F. Supp. 1130, 1134 (D. Nev. 1985)).  "In essence, the

duty of care consists of an obligation to act on an informed basis; the duty of loyalty requires the

board and its directors to maintain, in good faith, the corporation's and its shareholders' best

interests over anyone else's interests."  Shoen v. SAC Holding Corp., 137 P. 3d 1171, 1178

(Nev. 2006).

Nevada law presumes that directors and officers act in good faith, on an informed basis,

and with a view to the interests of the corporation when deciding upon matters of business.  See

Nev. Rev. Stat. § 78.138(3).  In general, a director or officer is not individually liable to the

corporation or its stockholders for any damages as a result of any act or failure to act in his or her

capacity as a director or officer unless it is proven that: "(a) the director's or officer's act or

failure to act constituted a breach of his or her fiduciary duties as a director or officer; and (b) the

breach of those duties involved intentional misconduct, fraud or a knowing violation of law."

Nev. Rev. Stat. § 78.138(7).[16]  Examples of such conduct include a director taking an excessive

salary, acting in his own self-interest, or exploiting an opportunity that belongs to the

corporation.  See Kahn v. Dodds (In re AMERCO Derivative Litig.), 252 P.3d 681, 701- 702

(Nev. 2011); Bedore v. Familian, 125 P.3d 1168, 1172-73 (Nev. 2006).

Hallal has not alleged that Roberts dismissed the Vicis and Deutsche Medical Actions as

a result of intentional misconduct, fraud, or a knowing violation of the law.  Rather, he alleges

that the dismissals were "self-interested," an unfair business practice, and a conflict of interest.

AC ¶¶ 137-138.  Hallal's memorandum in opposition to Roberts' motion attempts to salvage his

claim by arguing that Robert's acts "cannot be described as other than knowing or intentional, or

in bad faith."  Docket No. 53, p. 10.  However, this is not evident from the Amended Complaint,

and, as currently plead, is insufficient to state a claim.  Accordingly, the Court recommends

dismissal of the breach of fiduciary duty component of Count III against Roberts.

3.    Stastney

Hallal alleges that Stastney breached his fiduciary duties by: (1) directing Roberts to

dismiss the Vicis and Deutsche Medical Actions (Count III); and (2) negligently failing to adopt

policies regarding the collection of receivables (Count VIII).[17]  Because Stastney's position, or

lack thereof, at MSMI affects the Court's analysis of Hallal's claims, the Court will address each

---

[16]   Hallal argues that Massachusetts law applies, see Docket No. 53, p. 8-10, presumably
because Massachusetts law does not contain the requirement that a breach involve intentional
misconduct, fraud or a knowing violation.  Nevertheless, as stated supra, the Supreme Judicial
Court has ruled that the state of incorporation dictates the choice of law regarding the internal
affairs of a corporation, including the fiduciary duty owed to shareholders.  Harrison, 433 Mass.
at 470-2.

[17]   Hallal conceded at oral argument that he did not include a claim against Stastney in
Count I (breach of fiduciary duty).  Docket No. 63, p. 52:23-25.

claim separately.

a.      Dismissal Of Vicis And Deutsche Medical Actions

Hallal alleges that Stastney breached his fiduciary duties of loyalty, care and good faith and fair dealing to MSMI and its minority shareholders by directing Roberts to dismiss the Vicis and Deutsche Medical Actions.  At the time of the dismissal of the actions, however, Stastney was Chief Operating Officer of Vicis Capital and was no longer a director of MSMI.  AC ¶¶ 82, 124.[18]  Hallal seeks to hold Stastney liable as a de facto officer and director.  AC ¶ 134.  A de facto officer is one who "assumes possession of an office under the claim and color of an election or appointment and who is actually discharging the duties of that office, but for some legal reason lacks de jure legal title to that office."  Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.), 906 A.2d 27, 48 (Del. 2006).[19]  However, Hallal has not alleged that Stastney has done so, particularly in light of the fact that Stastney had resigned his director's position two years before the dismissal of the lawsuits.  Accordingly, the Court recommends dismissal of the breach of fiduciary duty component of Count III against Stastney.

b.      Policies Regarding Collection Of Receivables

Hallal alleges that Stastney, while a director of MSMI, breached his fiduciary duties because he did not: (1) adopt policies and procedures regarding the collection of receivables; (2)

---

[18]  Stastney resigned from MSMI's board of directors on January 28, 2009 and the lawsuits were dismissed on November 29, 2011.  AC ¶¶ 82, 131.

[19]  "Where there is no Nevada precedent on point this Court must predict how the Nevada Supreme Court would decide the question. Because the Nevada Supreme Court frequently looks to the Delaware Supreme Court and the Delaware Courts of Chancery as persuasive authorities on questions of corporation law, this Court often looks to those sources to predict how the Nevada Supreme Court would decide the question." Brown, 531 F. Supp. 2d at 1245.

monitor MSMI's officers, directors, and employees regarding collection policies; (3) reasonably investigate after notice of an unsafe or unsound practice; and (4) conduct MSMI's business in accordance with the law.  AC ¶¶ 162-171.

Director liability based on the duty of oversight "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  In re Caremark Int'l, 698 A.2d 959, 967 (Del. Ch. 1996).  "[O]nly a sustained or systematic failure of the board to exercise oversight . . . will establish the lack of good faith that is a necessary condition to liability."  Id. at 971.  To state a claim for breach of the duty of oversight, Hallal must plead facts sufficient to show that Stastney either knew or should have known that violations of the law were occurring, that he took no steps in a good faith effort to prevent or remedy that situation, and that such failure resulted in MSMI's losses.  Id.

For the purposes of surviving a motion to dismiss, Hallal has sufficiently stated a failure of oversight claim.  He has alleged that Stastney, while on the board of MSMI, involved MSMI in the Illegal Scheme by forwarding $250,000 to MSMI's account and instructed Fisher to pay that amount as a bribe.  AC  ¶¶ 73, 76.  He also alleges that despite his knowledge, he did not investigate or disclose these actions to other members of MSMI's board and that MSMI was damaged as a result.  AC ¶¶ 79, 168, 171.  Accordingly, this Court recommends that the District Court deny the motion to dismiss Count VIII against Stastney.

4.    Phillips

Hallal alleges that as a de facto officer of MSMI and the managing director of Vicis Capital, Phillips owed the fiduciary duties of loyalty, care and good faith and fair dealing to MSMI and its minority shareholders.  AC ¶¶ 7, 108.  Hallal alleges that Phillips violated his

fiduciary duty by participating in the insurance fraud scheme (Count I) and (2) negligently failing to adopt policies regarding the collection of receivables (Count VIII). Phillips argues that Hallal's claim should be dismissed because: (1) Hallal has not plead the claim with the particularity required under Rule 9(b); and (2) Phillips does not owe a fiduciary duty to MSMI because he was not a majority shareholder of MSMI and never served as a director or officer of MSMI; (c) he was never a de facto officer of MSMI; and (d) he never had a confidential relationship with MSMI or its minority shareholders. Docket No. 48, p. 7-12.

Under Nevada law, "a fiduciary relationship exists when one has the right to expect trust and confidence in the integrity and fidelity of another." Lopez v. Corral, No. 51541, 2010 WL 5541115, at * 2 (Nev. Dec. 20, 2010) (quoting Powers v. United Servs. Auto. Ass'n, 962 F.2d 596, 602 (Nev. 1998)). In other words, "a fiduciary relationship is deemed to exist when one party is bound to act for the benefit of the other party. Such a relationship imposes a duty of utmost good faith." Giles v. GMAC, 494 F.3d 865, 880-881 (9th Cir. 2007) (quoting Hoopes v. Hammargren, 725 P.2d 238, 242 (Nev. 1986)). "The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, since the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." Id. at 881. The Nevada Supreme Court has recognized fiduciary duties as a matter of law in several relationships, including corporate officers or directors and a corporation. Id.

Hallal does not allege that Phillips was an officer or director of MSMI or a majority shareholder, nor has he alleged that Phillips had a confidential relationship with MSMI or provided any legal basis that Phillips, as a managing director of Vicis Capital, had a duty to

36

adopt collection policies and procedures for MSMI.  Instead, Hallal seeks to hold Phillips liable because he was a "de facto officer of MSMI."  AC ¶ 108.  As stated supra, a de facto officer is one who "assumes possession of an office under the claim and color of an election or appointment and who is actually discharging the duties of that office, but for some legal reason lacks de jure legal title to that office."  In re Walt Disney Co. Derivative Litig., 906 A.2d at 48.  In the Amended Complaint, Hallal alleges that Stastney publically announced that Phillips was to become a member of the MSMI board of directors.  AC ¶ 52.  Hallal also alleges that Phillips: (1) oversaw the collection of the DMS receivables; (2) directed Fisher to use MSMI offices and its bank account to participate in the Illegal Scheme; and (3) directed Global's participation in the scheme. AC ¶¶ 53, 72-76; see also Exhibit A, Agreed-To Statement Of Facts, United States v. Phillips (Docket No. 29-1, p. 23-27).  Viewing the facts in the light most favorable to Hallal and granting all reasonable inferences in his favor, Hallal has sufficiently alleged that Phillips was a de facto officer of MSMI.  Accordingly, this Court recommends that the motion to dismiss Counts I and VIII against Phillips be denied.

      E.     Aiding And Abetting/Civil Conspiracy (Count II)

Hallal brings claims against Phillips, Stastney, and the Vicis Defendants for "aiding and abetting/civil conspiracy" to commit breaches of fiduciary duty in relation to the illegal insurance scheme and "aiding and abetting/civil conspiracy" in relation to Katz's conversion of the collected receivables.  AC ¶¶ 115-120.

All parties cite Nevada and Massachusetts law in support of their arguments and agree that the elements of the cause of action are similar in each state.  Because the choice of law determination would not alter the disposition of the legal question, this Court need not decide

which law controls, and will refer to Nevada and Massachusetts law interchangeably.  See

Okmyansky v. Herbalife Intern'l Of America, Inc., 415 F.3d 154, 158 (1st Cir. 2005).

A civil conspiracy claim[20] is "akin to a theory of common law joint liability in tort."

Aetna Cas. Sur. Co. v. P&B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994).  A plaintiff must

allege "first, a common design or an agreement, although not necessarily express, between two

or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the

agreement."  Id.[21]  This conspiracy "derives from 'concerted action' whereby liability is imposed

on one individual for the tort of another."  Law Offices Of Jeffrey S. Glassman v. Palmisciano,

690 F. Supp. 2d 5, 18 (D. Mass. 2009) (quoting Kurker v. Hill, 44 Mass. App. Ct. 184 (1998)).

The plaintiff need not prove the existence of an agreement by direct evidence but the agreement

may be inferred from conduct of the parties suggesting that they had an implied meeting of the

minds.  Payton v. Abbott Labs, 512 F. Supp. 1031, 1035 (D. Mass. 1981) (citations omitted).

Aiding and abetting is another variation of joint tort liability.  Liability for aiding and

abetting a tort attaches where: "(1) the defendant provides 'substantial assistance or

encouragement to the other party;' and (2) the defendant has 'unlawful intent, i.e., knowledge

---

[20]  Massachusetts law recognizes two types of causes of action for civil conspiracy.  The
first, referred to as "true conspiracy," is a "rare" and "very limited" cause of action.  Aetna Cas.
Sur. Co., 43 F.3d at 1563.  In order to state a claim for true conspiracy, the plaintiff must allege
and prove that by "mere force of numbers acting in unison," the defendants exercised "some
peculiar power of coercion of the plaintiff which any individual standing in a like relation to the
plaintiff would not have had."  Fleming v. Dane, 304 Mass. 46, 50 (1939) (citations omitted).
Hallal is not alleging this type of conspiracy.

[21]  Under Nevada law, civil conspiracy "consists of a combination of two or more persons
who, by some concerted action, intend to accomplish an unlawful objective for the purpose of
harming another, and damage results from the act or acts."  Consol. Generator-Nevada Inc. v.
Cummins Engine Co., 971 P.2d 1251, 1256 (Nev. 1998).

that the other party is breaching a duty and the intent to assist that party's actions.'" Go-Best

Assets Ltd. v. Citizens Bank of Mass., 79 Mass. App. Ct. 473, 487 (2011) (citations omitted).[22]

Plaintiff "must at least demonstrate some measure of 'active participation' and the knowing

provision of substantial assistance . . . to the principal's . . . alleged fraud." Schultz v. R.I. Hosp.

Trust Nat'l Bank, 94 F.3d 721, 730 (1st Cir. 1996) (citations omitted).

       1.    Breach Of Fiduciary Duty

Hallal alleges that Fisher, Phillips, Stastney, the Vicis Defendants, Katz, and MDwerks

conspired to, and aided and abetted, the breach of their fiduciary duties by participating in the

illegal insurance fraud scheme.  However, this claim is a jumble of names and alleged fiduciary

duties.  Hallal does not specify who conspired with whom, who aided or abetted whom, and

whose fiduciary duties were at issue.  Such a vague and confusing pleading does not satisfy Rule

8's pleading requirements, let alone the specificity required under Rule 9(b).  Accordingly, the

Court recommends that this portion of Count II be dismissed against Phillips, Stastney, and the

Vicis Defendants.

       2.    Conversion

Hallal alleges that Fisher, Phillips, Stastney, the Vicis Defendants, Katz, and MDwerks

conspired to participate in a "conversion scheme" whereby Katz and MDwerks kept the $2

million in collected receivables and did not turn them over to MSMI.  AC ¶¶ 96-101, 118.

---

[22] To establish aiding and abetting under Nevada law, a plaintiff must allege: (1) the
primary violator breached a duty that injured the plaintiff; (2) the alleged aider and abettor "was
aware of its role in promoting [the breach] at the time it provided assistance," and (3) the alleged
aider and abetter "knowingly and substantially assisted" the primary violator in committing the
breach. Tai-Si Kim v. Kearney, 838 F. Supp. 2d 1077, 1093 (D. Nev. 2012) (quoting Dow
Chem. Co. v. Mahlum, 970 P.2d 98, 112 (Nev. 1998)). See also Kahn, 252 P.3d at 702.

However, Hallal's only allegation regarding Phillips, Stastney, and the Vicis Defendants is that they "directed, approved, and sanctioned" the conversion of the funds.  AC ¶ 100; see also AC ¶ 53.  He provides no specifics in the Amended Complaint itself.  Moreover, there are no specifics about the conversion scheme and its harm to MSMI in the criminal documents attached to the Amended Complaint.  In connection with the conversion allegations, Hallal does not allege a common design or an agreement to do a wrongful act or any specific acts taken in furtherance of the agreement necessary to state a claim for civil conspiracy.  Hallal has also not alleged that these defendants provided substantial assistance or encouragement to Katz and MDwerks necessary to state a claim for aiding and abetting.  Accordingly, this portion of Count II should be dismissed against Phillips, Stastney, and the Vicis Defendants.

      F.      <u>Interference With Contractual Relations (Count VI)</u>

Hallal alleges that the Vicis Defendants, Stastney, and Phillips tortiously interfered with MSMI's contract with MDwerks by causing Katz and MDwerks to breach the contract.  AC ¶¶ 152-156.  These defendants argue that this claim should be dismissed because: (1) the Vicis Defendants would not intentionally interfere with MSMI's contract with MDwerks because it had a vested interest in MSMI's success; (2) Hallal has not sufficiently plead that the Vicis Defendants intentionally interfered with the contract because he has not plead that they were involved in the insurance scheme; and (3) the Amended Complaint states that Stastney was not aware of the insurance scheme.[23]  Docket No. 46, p. 23-25.

---

[23]  The Amended Complaint states that "Stastney knew or should have known of the Illegal Scheme."  AC ¶¶ 9, 70.  By making this statement, Stastney argues that "Plaintiff explicitly concedes that Mr. Stastney may not have had any knowledge of the alleged insurance fraud scheme."  Docket No. 46, p. 28.  However, at this stage, the Court must construe the Amended Complaint in the light most favorable to Hallal and for that reason does not credit

To prevail on a claim of intentional interference with a contract, Hallal must establish: "(1) [MSMI] had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Psy-Ed Corp. v. Klein, 459 Mass. 697, 715-716 (2011)[24] (quoting G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991)).[25]  Personal gain, including financial gain, is not enough to satisfy the improper interference requirement.  United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 817 (1990).  Where a defendant, such as Stastney or Phillips, is a corporate official acting in the scope of his corporate capacity, a plaintiff has a heightened burden of showing the improper motive or means constituted "'actual malice,' that is, 'a spiteful, malignant purpose, unrelated to the legitimate corporate interest.'" Psy Ed Corp., 459 Mass. at 716 (quoting Blackstone v. Cashman, 448 Mass. 255, 260-261 (2007)).

Hallal alleges that Stastney, Phillips, and the Vicis Defendants caused Katz and MDwerk's to "intentionally breach their contracts with MSMI."  AC ¶ 154.  Specifically, Hallal argues that these defendants interfered with MDwerk's obligations to pay MSMI the receivables it collected.  Docket No. 51, p. 25.  However, even assuming this argument is stated in the

---

Stastney's argument in its analysis.

[24]  Both parties cite Nevada and Massachusetts law in support of their arguments. Because the resolution of the choice of law determination would not alter the disposition of the legal question, this Court need not decide which law controls, and will refer to Nevada and Massachusetts law interchangeably.  Okmyansky, 415 F.3d at 158.

[25]  Under Nevada law, a plaintiff must show: "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." Hilton Hotels Corp. v. Butch Lewis Productions, 862 P.2d 1207, 1210 (Nev. 1993) (citing Sutherland v. Gross, 772 P.2d 1287, 1290 (Nev. 1989)).

Amended Complaint, Hallal has not alleged that these defendants actually interfered with the

contract or induced Katz and MDwerks to breach the contract.  Hallal alleges that these

defendants knew and approved of Katz's actions, but he does not allege they took any

affirmative steps to interfere with the contract.  Nor has he alleged that Phillips and Stastney

acted with actual malice.  He has provided only conclusory allegations.  Accordingly, this Court

recommends dismissal of Count VI against Phillips, Stastney and the Vicis Defendants.

G.      Interference With Advantageous Business Relations (Count VII)

Hallal brings an interference with advantageous business relations claim against, inter

alia, the Vicis Defendants and Phillips.  Hallal alleges that Phillips and the Vicis Defendants,

knew that MSMI had an advantageous relationship with "a multitude of third party businesses"

and induced a "breaking" of these relationships.  AC ¶¶ 157-161.  Phillips and the Vicis

Defendants argue that Hallal has failed to state a claim because the Vicis Defendants themselves

would be harmed by MSMI's loss of business and that Hallal has not identified the business

relationships with which the Moving Defendants interfered.  Docket No. 46, p. 24-25; Docket

No. 48, p. 17.[26]

In order to succeed on a claim for intentional interference with advantageous relations,

the plaintiff must establish that "(1) he had an advantageous relationship with a third party . . .

(2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's

interference with the relationship, in addition to being intentional, was improper in motive or

---

[26]  The Vicis Defendants and Phillips cite both Nevada and Massachusetts law in support
of their arguments, where Hallal argues that Massachusetts law applies.  See Docket No. 46, p.
25; Docket No. 48, p. 17; Docket No. 51, p. 26-27.  The Court need not resolve this issue,
however, as the outcome is the same under the substantive law under either jurisdiction.  See
Lambert v. Kysar, 983 F.2d 1110, 1114 (1st Cir. 1993).

means; and (4) the plaintiff was harmed by the defendant's actions." <u>Blackstone</u>, 448 Mass. at 260.[27]  Hallal has only stated that MSMI had a relationship with a "multitude of third party businesses."  Hallal must base his claim on "a specific business relationship that was interfered with" by the named defendants.  <u>Sherman v. Clear Channel Outdoor, Inc.</u>, No. 11-11669, 2012 U.S. Dist. LEXIS 104108, at * 22 (D. Mass. June 19, 2012) (quoting <u>Singh v. BC/BS of Mass., Inc.</u>, 308 F.3d 25, 47-48 (1st Cir. 2002)).  Hallal's vague allegation is insufficient to comply with <u>Twombly</u>.  Accordingly, this Court recommends that the motion to dismiss be granted for Count VII as against the Vicis Defendants and Phillips.

> H.    Chapter 93A (Count III and X)

Hallal brings two claims for violations of Chapter 93A against the Moving Defendants in separate counts.  First, Hallal alleges that the Vicis Defendants, Stastney and Roberts violated Chapter 93A by dismissing the Vicis Action.  Count III,  AC ¶ 138.   Second, Hallal alleges that the Vicis Defendants and Phillips, among others, violated Chapter 93A by carrying out the insurance fraud scheme.  Count X, AC ¶ 189.

The Moving Defendants argue that Hallal has failed to state a claim because: (1) Chapter 93A does not apply to internal corporate disputes and shareholder grievances; (2) the actions forming the basis for Hallal's claim did not occur "primarily and substantially within the Commonwealth;" (3) actions taken during litigation are not "trade or commerce" under Chapter

---

[27]  Under Nevada law, a plaintiff must establish: "(1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct."  <u>Oracle USA, Inc. v. Rimini St., Inc.</u>, No. 12-00106, 2010 U.S. Dist. LEXIS 84254, at * 13 (D. Nev. Aug. 13, 2010) (citing <u>Leavitt v. Leisure Sports, Inc.</u>, 734 P.2d 1221, 1225 (Nev. 1987)).

93A; and (4) the claim is merely a restatement of Hallal's previous claims.  Docket No. 44, 6-11;

Docket No. 46, p. 15-19; Docket No. 48, p. 19-21.

        1.      <u>Chapter 93A</u>

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or

commerce."  Mass. Gen. Laws ch. 93A, §2(a).  A successful claim under Chapter 93A requires a

showing of (1) a deceptive act or practice on the part of the defendant; (2) an injury or loss

suffered by the consumer, and (3) a causal connection between the defendant's deceptive act or

practice and the consumer's injury.  <u>Casavant v. Norwegian Cruise Line, Ltd.</u>, 76 Mass. App. Ct.

73, 76 (2009), <u>aff'd</u>, 460 Mass. 500 (2011) (citing G.L. c. 93A, § 9); <u>Hershenow v. Enterprise</u>

<u>Rent-A-Car Co. of Bos., Inc.</u>, 445 Mass. 790, 797 (2006).  "Chapter 93A liability is decided

case-by-case, and Massachusetts courts have consistently emphasized the 'fact-specific nature of

the inquiry.'"  <u>Arthur D. Little, Inc. v. Dooyang Corp.</u>, 147 F.3d 47, 55 (1st Cir. 1998) (citation

omitted).  "Although whether a particular set of acts, in their factual setting, is unfair or

deceptive is a question of fact, the boundaries of what may qualify for consideration as a Chapter

93A violation is a question of law."  <u>Id.</u> at 54 (quoting <u>Ahern v. Scholz</u>, 85 F.3d 774, 797 (1st

Cir. 1996)).

        2.      <u>Whether The Acts Occured Primarily And Substantially In Massachusetts</u>

In order to allege a viable Chapter 93A claim, the unfair or deceptive act must occur

"primarily and substantially within the Commonwealth." Mass. Gen. Laws c. 93A, § 11.  The

burden of proof is upon the person claiming that the transaction did not occur in the

Commonwealth.  <u>Id.</u>  "[W]hether the 'actions and transactions occurred primarily and

substantially within the commonwealth' is not a determination that can be reduced to any precise

formula." Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 472 (2003).

The Massachusetts Supreme Judicial Court has held that a court should make a determination

whether "the center of gravity" of the circumstances that give rise to the claim is primarily and

substantially within the Commonwealth "after making findings of fact, and after considering

those findings in the context of the entire § 11 claim." Id. at 472. "This would include, but not

be limited to, looking at the place of conduct and the 'situs of loss.'" Auto Shine Car Wash

Systems, Inc. v. Nice 'N Clean Car, 58 Mass.App.Ct. 685, 689 (2003) (quoting Kuwaiti Danish

Computer Co., 438 Mass. at 472 n.13).

Relying on their personal jurisdiction arguments, the Vicis Defendants and Stastney

argue that Chapter 93A does not apply to Hallal's allegations regarding the dismissal of the

lawsuits and the insurance scheme because the principal acts forming the basis of these claims

occurred outside of Massachusetts. Docket No. 46, p. 16-17. Hallal argues that the unfair and

deceptive actions occurred primarily and substantially in Massachusetts because MSMI was then

headquartered in Massachusetts, MSMI, the minority shareholders were injured in

Massachusetts, and the insurance scheme utilized a Massachusetts bank account. Docket No. 51,

p. 29-30.

This Court finds that Hallal's allegations are sufficient to overcome the motion to dismiss

on this basis, although factual development may reveal that the alleged misconduct occurred

predominantly outside of Massachusetts. See AngioDynamics, Inc. v. Biolitec, Inc., No. 09-

30181, 2011 U.S. Dist. LEXIS 80734, at * 27 (D. Mass. July 25, 2011); Berklee College of

Music, Inc. v. Music Indus. Educators, Inc., 733 F. Supp. 2d 204, 213 (D. Mass. 2010).

Accordingly, the Court recommends that the motion to dismiss on Counts III and X on this basis

be denied.

3.    <u>Claim Is Not Covered By Statute</u>

The Moving Defendants argue that Chapter 93A claims should be dismissed because the claims involve intracorprate disputes that are not covered by the statute.  Docket No. 44, p. 6-8; Docket No. 46, p. 15-16; Docket No. 48, p. 19-20.  Roberts also argues that Hallal's Chapter 93A claim should be dismissed because his dismissal of the Vicis Action is not trade or commerce covered by the statute.  Docket No. 44, p. 8-11.

Chapter 93A affords recovery to "any person who engages in trade or commerce" who suffers a loss by reason of unfair and deceptive conduct on the part of  "another person who engages in any trade or commerce."  Mass. Gen. Laws c. 93A, § 11.[28]  "'Unfair or deceptive acts or practices' . . . can only form the basis of a ch. 93A claim if those acts 'are perpetrated in a business context.'"[29] <u>St. Paul Fire and Marine Ins. Co. v. Ellis & Ellis</u>, 262 F.3d 53, 66 (1st Cir.

---

[28]  The Amended Complaint does not specify whether Hallal's 93A claim is a consumer action governed by Mass. Gen. Laws c. 93A § 9 or a business action governed by Mass. Gen. Laws c. 93A § 11.  The Court will assume, as have Defendants, that Hallal brings his claim under Section 11.  In any event, Hallal has failed to state a claim under Section 9, as he has not alleged that he served a written demand letter on Defendants at least thirty days prior to filing an action.  Mass. Gen. Laws ch. 93A § 9(3); <u>Rodi v. S. New Eng. Sch. of Law</u>, 389 F.3d 5, 19 (1st Cir. 2004).

[29]  The statute defines trade and commerce as:
> . . . the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, any security  . . . and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth.

M.G.L. c. 93A, § 1(b).

2001).  In addition, courts have interpreted this to mean that Section 11 was only intended to

apply to "dealings between legally separate 'persons' engaged in arms length transactions, and

not the dealings between members of a single legal entity."  <u>Newton v. Moffie</u>, 13 Mass. App.

Ct. 462, 467 (1982); <u>see</u> <u>also</u> <u>Szalla v. Locke</u>, 421 Mass. 448, 451 (1995) ( "[W]e conclude that

c. 93A requires that there be a commercial transaction between a person engaged in trade or

commerce with another person engaged in trade or commerce.").  In other words, "the unfair or

deceptive acts or practices prohibited [under G. L. c. 93A] are those that may arise in dealings

between discrete, independent business entities, and not those that may occur within a single

company."  <u>Puritan Medical Ctr. v. Cashman</u>, 413 Mass. 167, 179 (1992) (quoting <u>Manning v.</u>

<u>Zuckerman</u>, 388 Mass. 8, 12 (1983)).

In the stockholder context, courts have held that "Chapter 93A, a statute enacted to

provide protection to consumers and to provide protection against unfair methods of competition

or unfair or deceptive acts or practices in trade or commerce, does not reach alleged wrongs

asserted by a stockholder against a corporation in the internal governance of the corporation."

<u>Riseman v. Orion Research, Inc.</u>, 394 Mass. 311, 313-314 (Mass. 1985).  "Such stockholder is

not without an alternative method of obtaining relief," <u>id.</u> at 314, which may include a suit for

breach of fiduciary duty.  <u>Zimmerman v. Bogoff</u>, 402 Mass. 650, 663 (1988); <u>Puritan Medical</u>

<u>Ctr.</u>, 413 Mass. at 179.

In addition, the Massachusetts Supreme Judicial court has emphasized that Chapter 93A

"applies only to actions taken in the course of 'trade or commerce' and has never been read so

broadly as to establish an independent remedy for unfair or deceptive dealings in the context of

litigation."  <u>Morrison v. Toys R Us, Inc.</u>, 441 Mass. 451, 457 (2004) (internal citation omitted).

"[T]he purpose of G.L. c. 93A is to improve the commercial relationship between consumers and business persons and to encourage more equitable behavior in the marketplace." Id.

This Court finds that Hallal's Chapter 93A claim regarding the insurance fraud scheme against the Vicis Defendants and Phillips should be dismissed.  Hallal, in this shareholder derivative suit, alleges that the Vicis Defendants, through Phillips, and in its role as a majority shareholder, used MSMI and its president to engage in the insurance fraud scheme.  AC ¶¶ 177-190.  Such conduct relates to the internal governance of the corporation and is thus removed from Chapter 93A's purview.  Hallal's claim regarding Robert's dismissal of the Vicis Action should also be dismissed, as it did not involve legally separate persons and related to MSMI's internal governance.  Moreover, it was an action taken in the context of litigation.  Accordingly, the Court recommends that the District Court grant the motion to dismiss Count III in its entirety and Count X against the Vicis Defendants and Phillips.

## IV.   POTENTIAL CONFLICT OF INTEREST

As stated supra, at oral argument, the Court raised the issue of whether Hallal's current counsel has a conflict of interest because it previously represented MSMI.[30]  As discussed below, the Court does not have enough information before it to determine whether Hallal's counsel obtained confidential information.  However, the Court will explain the information it has received to date in order to better inform the District Court and the parties should this issue arise.

---

[30]  The Court also questioned whether counsel would have to be witnesses in the proceeding, because the basis of the breach of fiduciary duty/Chapter 93A claim (Count III) involved communications between Hallal's counsel and Roberts.  Because this issue will not arise until counsel testifies at trial, see Smaland Beach Assoc., Inc. v. Genova, 461 Mass. 214, 219-221 (2012), the Court will note the issue but not make a recommendation at this time.

A.      Conflict Of Interest

Attorneys, first and foremost, have the responsibility to know and comply with the rules

of professional conduct.  Borman v. Borman, 378 Mass. 775, 787 (1979).  In addition, the Court

has the duty and responsibility of supervising the attorneys who appear before it.  Eaves v. City

of Worcester, No. 12-10336, 2012 U.S. Dist. LEXIS 175113, at * 5-6 (D. Mass. Dec. 11, 2012).

"This responsibility includes the inherent authority to disqualify counsel."  Id. at *6.  However,

"court[s] should not lightly interrupt the relationship between a lawyer and her client."  Adoption

of Erica, 426 Mass. 55, 58 (1997).  "[D]isqualification, as a prophylactic device for protecting

the attorney-client relationship, is a drastic measure which courts should hesitate to impose

except when absolutely necessary."  Id. (internal quotation marks omitted).  However, "an

individual's right to counsel of his choice" must be reconciled "with the obligation of

maintaining the highest standards of professional conduct and the scrupulous administration of

justice."  Rodriguez v. Montalvo, 337 F. Supp. 2d 212, 217 (D. Mass. 2004).

B.      Facts Related To Potential Conflict

Count III of the Amended Complaint brings claims for a breach of fiduciary duty and

violations of Mass. Gen. Laws c. 93A against Vicis Capital Master Fund Ltd., Vicis Capital,

LLC, Shadron Stastney and Greg Roberts in relation to their dismissal of lawsuits filed by

MSMI.  Specifically, Hallal alleges that in the fall of 2011, Marshall Sterman, who at that time

was the sole officer and director of MSMI, authorized MSMI to file a lawsuit in this District

against the Defendants in this action ("the Vicis Action").  AC ¶ 105(b).[31]  The complaint was

---

[31]  Sterman also authorized the filing of a lawsuit by MSMI and its subsidary against
other individuals.  AC ¶ 150(i), n. 1; Exhibit H.  Messrs. Brown and Schlichtmann were also
MSMI's counsel in that action.  Id.

filed on November 3, 2011.  AC ¶ 105(c); Exhibit F; <u>see</u> <u>Medical Solutions Management, Inc. v.</u>
<u>Vicis Capital, LLC, et al</u>, No. 11-11949-DPW.  Orestes G. Brown, and his law firm Metaxas
Brown Pidgeon LLP,  Hallal's counsel in this action, were listed as MSMI's counsel of record in
the Vicis Action.  Exhibit F.  Jan R. Schlichtmann, who appears in this action on Hallal's behalf,
also appeared on behalf of MSMI in the Vicis Action.  <u>See</u> Exhibit F at Docket No. 7.

In their investigation of the facts relevant to these claims, Messrs. Brown and
Schlichtmann "reviewed federal criminal pleadings, interviewed witnesses, reviewed contracts
and public corporate filings and reviewed MSMI corporate communications by and between
MSMI officers, directors, and employees."  Affidavit of Orestes G. Brown, ¶ 5, Docket No. 62-1.
Counsel assert that "[n]one of the information reviewed or received in relation to the
investigation of these claims were of a confidential nature and most of the information had
already been made a part of a federal criminal investigation."  <u>Id.</u>

Hallal alleges that on November 16, 2011, the Vicis Defendants removed Sterman from
office and appointed Greg Roberts, a Vicis employee, as sole officer and director of MSMI.  AC
¶ 105(e).  On November 21, 2011, Roberts sent letters to Messrs. Brown and Schlichtmann
directing them to dismiss the Vicis Action.  AC ¶105(i); Exhibits B, G.  Messrs. Brown and
Schlichtmann contacted Vicis counsel, Quarles and Brady, LLP and informed them that they
"could not, in any event, take any action at the behest of the Vicis defendant [sic] to the
detriment of MSMI."  Brown Affidavit, ¶ 11.  Hallal's counsel asserts that they never
communicated with Roberts or the Vicis Defendants except through their counsel.  <u>Id.</u>

When counsel informed Roberts that they could not dismiss the matter as instructed,

Roberts terminated them as counsel.  AC ¶¶ 105(j), (k).[32]  Roberts hired new counsel, and on

November 29, 2011, the new counsel filed a notice of voluntary dismissal of the Vicis Action.

AC ¶¶ 105(l)-(n).  On January 27, 2012, Messrs. Brown and Schlichtmann filed the instant

action, alleging "fundamentally the same claims against the same defendants as were alleged in

the initial, dismissed complaint."  Brown Affidavit, ¶ 14.

      C.     <u>Analysis</u>

          1.     <u>Rule 1.9(a)</u>

Pursuant to Rule 1.9(a), "[a] lawyer who has formally represented a client in a matter

shall not thereafter represent another person in the same or a substantially related matter in

which that person's interests are materially adverse to the interest of the former client unless the

former client consents after consultation." Rule 1.9, Massachusetts Rules of Professional

Conduct.[33] "[T]he spirit of Rule 1.9 is that a law firm retains a limited duty of loyalty to a former

client—it may not use a former client's confidential information against that client, and should

not represent a new client in any matter where the former client reasonably should fear that its

earlier confidences will be misused."  <u>Eaves</u>, 2012 U.S. Dist. LEXIS 175113, at *11 (quoting

<u>Nat'l Med. Care v. Home Med. of Am., Inc.</u>, No. 00-1225, 2002 WL 31068413, *8 (Mass.

Super. Sept. 12, 2002)).

In order for the Court to find that an impermissible conflict exists between a former and

---

[32]  Roberts argues that the termination letters demonstrate the Brown and Schlichtmann did not always communicate with him through counsel.  Docket No. 65, p. 4.

[33]  This Court's Local Rules provide that the Massachusetts Supreme Judicial Court Rules, set forth in Rules 3:05, 3:07 and 3:08, govern the ethical conduct of attorneys in this Court.  <u>See</u> Local Rule 83.6(4).  Rule 3:07 contains the Massachusetts Rules of Professional Conduct.

current client: "(1) the current representation must be adverse to the interests of the former

client; and (2) the matters of the two representations must be substantially related." ebix.com,

Inc. v. McCracken, 312 F. Supp. 2d 82, 89 (D. Mass. 2004) (quoting In Adoption of Erica, 426

Mass. at  61) (internal quotation marks omitted).  The purpose of the substantially related test is

"to preserve client confidences by avoiding an 'intolerably strong temptation' to betray them, the

assessment of whether matters are 'substantially related' must focus on whether the overlap or

similarity between the two matters would potentially give rise to such a temptation.'" Id.

(internal citations and citations to quoted cases omitted).  "This turns on whether it is 'reasonable

to assume that confidential information would have been given to the attorney in the first matter

that would be helpful to the adverse client in the second matter.'" Id.  The former client is not

required to prove that the attorney actually misused the information, "but only need show that

the tempting situation existed because of an attorney- client relationship that was established in

the former representation, and that the 'former and current representations are both adverse and

substantially related.'" Rodriguez, 337 F. Supp. 2d at 218 (quoting Bays v. Theran, 418 Mass

685, 691 (1994)).

      "When an attorney represents a corporation, the attorney retains his obligation of loyalty

to that corporation, no matter who may be its current owner."  New Eng. Pro Tour, Inc. v. Hebb,

No. 06-4901, 2007 Mass. Super. LEXIS 237, at *15 (Mass. Super. Ct. 2007).  "The attorney

cannot represent the corporation as to a matter when it is controlled by [one person] on one day,

and then represent another client adverse to the corporation as to that same matter once the

corporation is controlled by [another person]."  Id.

      Hallal's counsel does not dispute that the current action is substantially similar to the

Vicis Action.  In fact, Hallal's counsel stated in his affidavit that the current action states "fundamentally the same claims against the same defendants as were alleged in the initial, dismissed complaint."  Brown Affidavit, ¶ 14.  Accordingly, the Court concludes that the two representations are substantially similar.

Hallal's counsel does dispute, however, whether the actions are in fact adverse.  They argue that because the Amended Complaint is a derivative shareholder action in which MSMI is only a nominal defendant, they are in fact bringing this claim in MSMI's interest.  Docket No. 62, p. 4-5; Docket No. 70, p. 8.  In a shareholder derivative action, the corporation is only a nominal defendant and is the beneficiary of any recovery.  See Guzewicz v. Eberle, 953 F. Supp. 108, 110 (E.D. Pa. 1997); George v. Le Blanc, 78 F.R.D. 281, 291-2 (N.D. Tex. 1977).  In fact, courts have used this logic to argue that attorneys cannot represent both the nominal defendant corporation and the directors.  See Steepak v. Addison, 20 F.3d 398, 404 (11ᵗʰ Cir. 1994).  Accordingly, Hallal's complaint does not appear to be materially adverse to the interests of MSMI, and Hallal's counsel's representation does not run against Rule 1.9(a) at this time.

        2.        Rules 1.6(a) And 1.8(b)

Rule 1.6(a), states, in pertinent part, that: "[a] lawyer shall not reveal confidential information relating to representation of a client unless the client consents after consultation." Rule 1.6, Massachusetts Rules of Professional Conduct. Rule 1.8(b), states, in pertinent part, that: "[a] lawyer shall not use confidential information relating to representation of a client to the disadvantage of the client or for the lawyer's advantage or the advantage of a third person, unless the client consents after consultation ..."  Rule 1.8, Massachusetts Rules of Professional Conduct. Roberts alleges that Hallal's counsel has used confidential information from its prior

representation of MSMI.  Docket No. 65, p. 4.  Specifically, he points to Exhibits B and G to the

Amended Complaint, which are letters from him to Messrs. Brown and Schlichtmann directing

them to withdraw the lawsuits.  Id.  Hallal's counsel maintains that these letters do not represent

confidential communications.  Docket No. 70, p. 6-8.

"The confidentiality rule applies not merely to matters communicated in confidence by

the client but also to virtually all information relating to the representation, whatever its source."

Rule 1.6, Massachusetts Rules of Professional Conduct, Comment 5.  The word "virtually"

reflects "the common sense understanding that not every piece of information that a lawyer

obtains relating to a representation is protected confidential information."  Rule 1.6,

Massachusetts Rules of Professional Conduct, Comment 5A.  "[S]ome information is so widely

available or generally known that it need not be treated as confidential. . . . [T]he mere fact that

information disclosed by a client to a lawyer is a matter of public record does not mean that it

may not fall within the protection of this rule."  Id.

In their investigation of the facts relevant to these claims, Messrs. Brown and

Schlichtmann "reviewed federal criminal pleadings, interviewed witnesses, reviewed contracts

and public corporate filings and reviewed MSMI corporate communications by and between

MSMI officers, directors, and employees."  Affidavit of Orestes G. Brown, ¶ 5, Docket No. 62-1.

Counsel assert that "[n]one of the information reviewed or received in relation to the

investigation of these claims were of a confidential nature and most of the information had

already been made a part of a federal criminal investigation."  Id.

At this time, this Court does not have sufficient information to determine whether

Hallal's counsel used MSMI's confidential information in its representation of Hallal.

54

Accordingly, this Court does not recommend the disqualification of Hallal's counsel at this time.

## V.      CONCLUSION

For the foregoing reasons, I recommend that the District Court grant Roberts' motion to dismiss (Docket No. 43), and grant in part and deny in part the motions to dismiss of Phillips (Docket No. 47) and Stastney and the Vicis Defendants (Docket No. 45) as follows:

- •      Count I (breach of fiduciary duty related to the Illegal Scheme): denied as to the Vicis Defendants and Phillips;

- •      Count II (aiding and abetting/civil conspiracy): granted as to the Vicis Defendants, Stastney, and Phillips;

- •      Count III (fiduciary duty component): granted as to Roberts and Stastney, denied as to the Vicis Defendants;

- •      Count III (Chapter 93A component): granted as to Roberts, the Vicis Defendants, and Stastney;

- •      Count IV (breach of contract): granted as to Phillips and the Vicis Defendants;

- •      Count V (breach of the covenant of good faith and fair dealing): granted as to Phillips and the Vicis Defendants;

- •      Count VI (interference with contractual relations): granted as to the Vicis Defendants, Stastney, and Phillips;

- •      Count VII (interference with advantageous business relations): granted as to the Vicis Defendants and Phillips;

- •      Count VIII (breach of fiduciary duty related to the adoption of policies and procedures): granted as to the Vicis Defendants, but denied as to Stastney

and Phillips; and

- Count X (Chapter 93A): granted as to the Vicis Defendants and Phillips.

If the District Court adopts this Report and Recommendation, the following claims will

remain against the Moving Defendants:

- Count I (breach of fiduciary duty related to the Illegal Scheme) against the Vicis

  Defendants and Phillips;

- Count III (fiduciary duty component) against the Vicis Defendants; and

- Count VIII (breach of fiduciary duty related to the adoption of policies and

  procedures) against Stastney and Phillips.

## VI.    REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any

party who objects to these proposed findings and recommendations must file specific written

objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report

and Recommendation.  The written objections must specifically identify the portion of the

proposed findings, recommendations, or report to which objection is made, and the basis for such

objections.  See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b).  The parties are further advised

that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to

comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's

order based on this Report and Recommendation.  See Phinney v. Wentworth Douglas Hosp.,

199 F.3d 1 (1st Cir. 1999); <u>Sunview Condo. Ass'n v. Flexel Int'l, Ltd.</u>, 116 F.3d 962 (1st Cir.

1997); <u>Pagano v. Frank</u>, 983 F.2d 343 (1st Cir.1993).

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge
